**Aceti v. Dinoski**

C.P. of Monroe County, no. 1003 DR 1999.

*Arthur L. Zulick,* for plaintiff.
*Thomas P. Sundmaker,* for defendant.
*Elizabeth Bensinger Weekes,* for Monroe County Children and Youth Services.

WORTHINGTON, *J.,* June 13, 2000—The plaintiff Christopher Aceti, Father, and defendant Patricia Dinoski, Mother, come before the court concerning custody of their daughter, Tara, age 9. Tara was born in Boynton Beach, Florida on February 8, 1991 as a result

of a brief relationship between Mother and Father. Her parents were not living together at the time of her birth. Shortly after birth, Tara moved with her mother to New Jersey and has had only sporadic contact with her father when he traveled to visit her in New Jersey and Pennsylvania or when Mother took her to visit with him in Florida.

This case comes before the court in a somewhat unusual manner. Unlike most evidentiary hearings where the parties have been embroiled for many months and sometimes years in custody litigation, this case has never before come to the court's attention with respect to custody. In fact, the first and only complaint for custody was filed by Father on October 8, 1999 in response to the filing of a petition for hearing in a dependency proceeding filed by Monroe County Children & Youth Services on October 4, 1999 to no. 31 NC 1999. The Honorable Peter J. O'Brien found Tara to be a dependent child after hearing on October 13, 1999 and as part of his order states that "Since the goal of the family service plan is to return the child to live with one of her parents, the custody conciliation conference scheduled for November 15, 1999 in an action captioned at 1003 DR 1999 shall proceed as scheduled notwithstanding the present dependency status of this child." On November 15, 1999 a conciliation conference was held resulting in a recommendation by the conciliator and a court order for home study and psychological evaluations in preparation for an evidentiary hearing. Tara lived in a foster home from September 30, 1999 through January 2000 when she was placed with her maternal aunt and uncle, Judy and Scott Angus in Bangor, Pennsylvania. An evidentiary hearing was held on Father's petition for custody on April 25,

2000 and the court will now dispose of the issues before us.

In any custody case, the court's paramount concern must be for the best interest of the child. *Wiseman v. Wall,* 718 A.2d 844 (Pa. Super. 1998); *Mumma v. Mumma,* 380 Pa. Super. 18, 550 A.2d 1341 (1988). The child's physical, intellectual, moral and spiritual well-being are of the utmost importance. *Wiseman,* 718 A.2d at 847; *Swope v. Swope,* 455 Pa. Super. 587, 689 A.2d 264 (1997). However, these concepts are nebular terms rendering them amenable to neither simple definition nor application. See *Morris v. Morris,* 271 Pa. Super. 19, 412 A.2d 139 (1979). There are no presumptions in favor of either parent and the court must make its determination based solely on the particular facts and circumstances of each case. *Sawko v. Sawko,* 425 Pa. Super. 450, 625 A.2d 692 (1993). In short, this court is obliged to consider all relevant factors that could affect the child's well-being. *Andrews v. Andrews,* 411 Pa. Super. 286, 601 A.2d 352 (1991), *alloc. granted,* 533 Pa. 605, 618 A.2d 397 (1992), *aff'd,* 533 Pa. 354, 625 A.2d 613 (1993).

In this case we heard testimony from numerous witnesses and had the benefit of home studies and psychological evaluations on Mother, Father and Tara. Additionally, we spoke with Tara in chambers.

Mother is 35 years old and unemployed. She is married to Michael Gaffin and is eight months pregnant. Mother graduated from Montville High School in New Jersey in 1982 and attended cosmetology school for one year. She has essentially worked sporadically as a waitress since that time. She moved around a great deal since her high school graduation and in 1990 moved to Delray Beach, Florida where she met Mr. Aceti. Their relation-

ship lasted approximately three weeks and following its ending Mother learned that she was pregnant with Tara.

Father is 39 years old and is employed as a production associate at Motorola and has been with the same company for almost five years. He resides in his own home in West Palm Beach, Florida which he purchased approximately five years ago. He has lived in Florida for 14 years. Before his employment at Motorola, he worked for Borden Dairy for 10 years as a route salesman.

The instant case presents special difficulties as it contains a direct conflict between the emotional ties and bonds between Tara and her mother versus the stability and consistency of Father. Father's request for primary custody is also a request for relocation of the child to Florida and will be analyzed as such.

In a hearing where relocation of a child is at issue, the court must analyze the facts presented in relation to the standards enunciated in *Gruber v. Gruber,* 400 Pa. Super. 174, 583 A.2d 434 (1990). Although the court in *Gruber* addressed the relocation of a custodial parent, the Superior Court in *Clapper v. Harvey,* 716 A.2d 1271 (Pa. Super. 1998) directs that in appropriate cases the factors outlined in *Gruber, supra* be considered as part of the overall best interest analysis when a non-custodial parent wants to relocate with the child.

The factors enumerated in *Gruber* are:

(1) The potential advantages of the proposed move, economic or otherwise, and the likelihood the move would improve substantially the quality of life for the custodial parent and the children and is not the result of a momentary whim on the part of the custodial parent;

(2) The integrity of the motive of both the custodial and non-custodial parent in either seeking the move or seeking to prevent it; and

(3) The availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent. *Gruber v. Gruber,* 400 Pa. Super. at 184-85, 583 A.2d at 439; *Beers v. Beers,* 710 A.2d 1206, 1208-1209 (Pa. Super. 1998); *Plowman v. Plowman,* 409 Pa. Super. 142, 154, 597 A.2d 701, 707 (1991). Furthermore, the *Gruber* considerations must be applied under the "umbrella of the ultimate objective of determining the best interests of the child." *Anderson v. McVay,* 743 A.2d 472, 474 (Pa. Super. 1999).

Under *Gruber* as applied in this case, we must assess the potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the child and is not the result of a momentary whim on the part of the parent.

Father's request for primary custody of Tara can hardly be viewed as a momentary whim. His reasons for filing a complaint after nine years is clear—Tara was removed from Mother's custody by the police and taken into protective custody. She was then found to be a dependent child and placed with Mother's sister and brother-in-law in Bangor, Pennsylvania.

We believe that Mother loves Tara immensely, but that her choices in life adversely affect this child. While Father has not had the opportunity to know Tara well, partly by his own fault, his choices in lifestyle have been steady and consistent. Mother's lifestyle can best be described as nomadic, travelling from Florida to New Jersey, back to Florida, on to Arizona and finally Pennsylvania. Since

this case came to the court's attention in October of 1999, Mother has lived in three different residences in two different counties. Throughout these moves Tara has had to change schools and adapt to changes in friendships as well. Mother has moved from job to job as a waitress and is currently unemployed. She is eight months pregnant and collecting disability which she states will end in September. When asked how she will support herself, she said that she has $20,000 in the bank and $11,000 that she has put up as bail for her husband. She also testified that her father pays the rent on her apartment.

Maternal grandfather appears to be the person who has bailed Mother out of trouble along the way and in doing so has made every attempt to protect Tara and give her some stability. He and Tara have a very close relationship and she also has a close relationship with her maternal aunt and uncle with whom she has been living during her dependency status. Mother does not have a good relationship with her own mother.

In stark contrast to Mother's lifestyle, Father owns his own mobile home where he has lived for almost five years. He has resided for almost fifteen years in Florida and is currently employed at Motorola. He has held his current job for almost five years and worked steadily for Borden Dairy for 10 years preceding his current employment. He has extended family, including his mother, who is recently remarried, his brother, sister-in-law, nieces and nephews who live in the West Palm Beach area, some within four miles of his home.

Father describes his home as being in a family park with a playground and many children. Tara would be attending Growth Park Elementary School where her cousins attend school and day care would be provided

by Father's sister-in-law who is a stay-at-home mom. Based on these factors, we believe that a move would substantially benefit the child in providing stability and consistency in her life.

The second factor in *Gruber* is to explore the integrity of the motives of both the custodial and the non-custodial parent in either seeking the move or seeking to prevent it. We find that Father has no insincere motives in seeking the child's relocation. In fact, it appears that he has stepped up to the plate and wants only to provide this child with a better life and future. Mother's motives in seeking to prevent the move are mostly sincere in that she has been Tara's primary caretaker for all of the child's life. Mother stressed the fact that they do very "girly" things together with hair and make-up that a father won't be able to do. Although there is conflicting testimony on this point, we believe that Mother does not really want Tara to have a relationship with her Father and to that extent her motives may be insincere. Overall, neither party appears to have insincere motives and we therefore find that the second factor in *Gruber* has been met.

Finally, we must consider the availability of realistic substitute visitation arrangements which would adequately foster an ongoing relationship between the child and the non-custodial parent.

Mother is not employed and will soon have another child. Her financial resources appear to be limited and we question how she will be able to support herself and her children. She testified she expects to go to work on the weekends after the baby is born. Father is employed full-time. We believe that based on prior history in this case, the parents do not seem to communicate well and any substitute arrangements would have to be specific

in all areas so that the parties can understand them and comply. Father has traveled to Pennsylvania at least three times over the past five months to participate in dependency and custody proceedings and it appears he is not adverse to flying the child and continuing contact with Mother. He has always purchased the tickets in the past for Mother and Tara to come to Florida and would be willing to allow Tara to stay at Mother's home provided he believed she would be safe. We therefore believe that alternate, substitute visitation arrangements are available pursuant to the third *Gruber* factor.

In *Lee v. Fontine,* 406 Pa. Super. 487, 489-90, 594 A.2d 724, 726 (1991) our Superior Court held that the *Gruber* test does not replace the best interest standard in child custody disputes but merely provides a framework in which to conduct that analysis. When determining what is in Tara's best interest, the court must consider a variety of factors including the preservation of the child's physical, intellectual, moral and spiritual well-being. Father's request for primary custody is a drastic and complete shift in what Tara has known for all her life. However, when the facts presented at hearing are carefully scrutinized, we believe that it is in Tara's best interest to be with her Father.

Currently, legal and physical custody of Tara is vested in Monroe County Children & Youth Services pursuant to an order of court in dependency. The standard for adjudicating a child dependent is "clear and convincing" evidence as well as a showing of clear necessity. *Helsel v. Blair County CYS,* 359 Pa. Super. 487, 519 A.2d 456 (1986); 42 Pa.C.S. §6341(c). Once a child is adjudicated dependent, however, the issues of custody and continuation of foster care are determined according to a child's

best interests. *In re Miller,* 380 Pa. Super. 423, 552 A.2d 261 (1988); *In Interest of Sweeney,* 393 Pa. Super. 437, 574 A.2d 690 (1990). Evidence presented at hearing supports Father's position that dependency should be terminated and that physical custody should be awarded to him.

At the hearing Mother testified that she had completed all of the requirements of the family service plan mandated by Monroe County Children & Youth Services. She also testified that she was seeking psychiatric care but that she was unable to take her medication because of her pregnancy. While we must commend Mother for seeking the care she needs, we were left with the feeling that everything she has done was in preparation for trial and that, left to her own devices, she would again make poor lifestyle choices that would adversely impact Tara and that we would again see this case in the dependency forum.

As stated earlier, Mother has moved numerous times between four states with Tara since her birth. She married Michael Gaffin after the commencement of this case but her testimony at hearing indicated that they were separated and would not be residing together again. Statements made by Mother on examination led this court to believe that she is less than sincere about keeping Mr. Gaffin out of her life and that he will be living with Mother again in the future. Credible evidence presented at hearing showed that Mother has a criminal record including convictions for aggravated assault and neglect of child (Tara) within the past three years. At the time of the hearing there were charges of possession of controlled substance pending. Likewise, Mother's husband, Michael Gaffin, has a criminal record and at the time of hearing

was awaiting sentencing for aggravated assault on a police officer. The incident occurred the night that Tara was taken into protective custody.

In April of 2000 Mother called the police to her home where they found her husband intoxicated, glass broken, another person bleeding, and where Mother gave the police officer what appeared to be drug paraphernalia. In formulating a custody order, the court shall consider each parent and adult household member's present and past violent or abusive conduct 23 Pa.C.S. §5303(a)(3). The description at hearing by both Sargent Gary Larsen and Ms. Gaffin herself paints a picture of a household environment that would not be in the best interest of any child.

One of the other factors in determining the welfare of a child is the child's "stable" relationship with an established parental figure and a "known physical environment." Mother is correct in her statement that Father is not an established parental figure for Tara in that they have spent minimal time together for reasons that we will discuss hereafter. However, by her own testimony, Mother's relationship with Tara is more like that of a "best friend" and although they love each other very much, it is clear that Mother has not made many mature choices in her life based upon Tara's best interests. Although we agree that a parent's ability to care for a child is to be based on facts existing at the time of hearing, we believe that Mother's past conduct is indicative of a pattern of behavior and that the present facts surrounding her life are not much better. *Brooks v. Brooks,* 319 Pa. Super. 268, 466 A.2d 152 (1983); *Hall v. Mason,* 316 Pa. Super. 160, 462 A.2d 843 (1983); *Witmayer v. Witmayer,* 320 Pa. Super. 372, 467 A.2d 371 (1983).

We believe that given all of the facts surrounding her choices and care of the child that her ongoing behavior will have a negative impact on the welfare and well-being of the child. *Witmayer, supra; Hartman v. Hartman,* 328 Pa. Super. 154, 476 A.2d 938 (1984).

By contrast, Father's home environment and lifestyle are stable and consistent, although not extravagant. He owns a modest home and has been steadily employed by the same company for five years. He has extended family nearby who will help care for Tara and cousins with whom she will attend school. Likewise, Mother has extended family and Tara is very close to her maternal grandfather. Mother however, is estranged from her own mother, and her sister and brother-in-law who have cared for Tara during her dependency status are no longer willing to do so. We have considered the extended family situation and find that through the testimony of Mr. Dinoski, the maternal grandfather, and Mrs. Aceti, the paternal grandmother, that both are willing to help with Tara and want to be a part of her life. In fact, Mr. Dinoski seems to have been the most stable influence in Tara's life since birth.

A troubling portion of this case is that Father has had minimal contact with Tara. There is conflicting testimony regarding the reasons. Mother says that Father wanted her to have an abortion, that he denied paternity and that she has done everything in her power to try and foster a relationship between Father and Tara. Father states that he has been met with interference and that because of the hostility between him and Mother every visitation ended prematurely. He testified that Mother would just leave with Tara and wouldn't let him know her whereabouts, for example, Arizona. Hostilities between the

parents are relevant in custody proceedings only insofar as they constitute a threat to the child or affect the child's welfare. *Nancy E.M. v. Kenneth D.M.*, 316 Pa. Super. 351, 462 A.2d 1386 (1983). There is significant conflict between the parties in this case. We note that Mother would often answer questions with hostility and give glaring looks to Father. Mother was overheard by Attorney Weekes in the courtroom speaking with Tara during a recess. On cross-examination Attorney Weekes asked Mother:

"Q. Did you talk to Tara at all today when you were in the courtroom with her?

"A. Yes.

"Q. What did you say to her?

"A. I asked her if her dad sent her something for Easter.

"Q. Did you ask her what she had in her hands?

"A. Yes.

"Q. What did you say to her?

"A. I asked her what she was shooting with it.

"Q. Did you ask, is that a gun to shoot your dad?

"A. No, I did not say that. If you seen it, you can tell. It looks like a firecracker, like a rocket.

"Q. You said, is that to shoot her dad?

"A. Yes, I did." (N.T. p. 182.)

The court must also consider which parent is more likely to encourage, permit and allow frequent and continuing contact and physical access between the non-custodial parent and the child. 23 Pa.C.S. §5303(a)(2). Mother's statement in the courtroom on the day of hearing makes us believe that her testimony regarding Father's desired involvement is less than credible and that Father will more likely encourage contact.

Finally, we consider Tara's testimony and feelings. Tara is an articulate 9-year-old who, as expected, wants to live with her mother. She struck the court as guarded when discussing matters in her mother's house. She appeared to want to protect her mother and say the right thing. Although generally, a child's expressed wishes are not controlling in a custody decision, they are an important factor that the court must consider when those wishes are based on good reasons, taking into account a child's age, maturity and intelligence. *Cardamone v. Elshoff,* 442 Pa. Super. 263, 659 A.2d 575 (1995). When asked by counsel what she would order if she were in charge, she said she would live with her mom because "I really love her." We believe that Tara loves her mom but we also believe that she loves her dad and actually appears confused about what to say with regard to him. The primary reason for Tara's preference is valid, that being that Mother is the only parent she has known. This reason, however, is outweighed by the other evidence presented that the child's well-being is better served in the primary custody of Father.

Although counsel for Mother raises the issue of siblings being raised together (Ms. Gaffin's baby is due in July 2000), we believe that at this juncture the best interest of Tara dictates that she should be in a stable, safe environment. We believe that she can still have a close bond with her new sibling by fashioning an order that facilitates their relationship. It is our opinion that Tara's best interest will be served by an award of primary custody to her father. The Superior Court in *Warren v. Rickabaugh,* 410 Pa. Super. 431, 600 A.2d 218 (1991) considered a situation where a long-standing custody arrangement with mother was changed to place the chil-

dren primarily with father in another state. Over the years, Father has shown an interest in Tara, although not actively, but we believe that in large part Mother's actions were responsible. Father immediately became involved when he was informed of the protective custody situation and has pursued the matter vigorously. Mother's home life and environment is not conducive to the child's well-being while Father's is stable and consistent.

Accordingly, we enter the following:

## ORDER

And now, June 13, 2000, it is hereby ordered as follows:

*(1) Legal custody* of Tara Dinoski shall be shared by Mother and Father. Legal custody includes but is not limited to:

(a) All decisions affecting the child's growth and development, including but not limited to education, medical and dental treatment, religious training, athletic pursuits and extracurricular activities shall be considered major decisions and shall be made by the parents jointly, after discussion and consultation with each other and with a view toward obtaining and following a harmonious policy in the child's best interests;

(b) Each party agrees to keep the other informed of the progress of the child's education and social adjustment. Each party agrees not to impair the other party's right to shared legal or physical custody of the child. Each party agrees to give support to the other in the role as parent and to take into account the consensus of the other for the physical and emotional well-being of the child with a recognition that their lifestyles are different;

(c) While in the presence of the child, neither parent shall make, or permit any other person to make, any remarks nor do anything which could in any way be construed as derogatory or uncomplimentary to the other parent. It shall be the express duty of each parent to uphold the other parent as one whom the child should love and respect;

(d) It shall be the obligation of each parent to make the child available to the other in accordance with the following schedule and to encourage them to participate in the plan hereby ordered;

(e) Each parent shall have the duty to notify the other of any event or activity that could reasonably be expected to be of significant concern to the other parent or to the child;

(f) The parents shall communicate with one another concerning any parenting issues regarding any proposed modification to the custody schedule, understanding that modification may at times be necessary, the parents shall specifically not use the child as messenger. Furthermore, neither parent shall discuss with the child any proposed changes to the schedule or any other issue requiring consultation and agreement, prior to discussing the matter and reaching an agreement with the other parent;

(g) With regard to any emergency decisions that must be made, the parent with whom the child is physically residing at the time shall be permitted to make the decision necessitated by the emergency without consulting the other parent in advance. However, that parent shall inform the other of the emergency and consult with him or her as soon as possible. Day-to-day decisions of a routine nature will be the responsibility of the parent having physical custody at the time;

(h) Each parent shall be entitled to complete and full information from any doctor, dentist, teacher or authority and have copies of any reports given to them as a parent. Such documents include, but are not limited to medical reports, academic and school reports, birth certificates, etc. Both parents may and are encouraged to attend school conferences and activities. Both parents shall be listed with the school as parents to be contacted in the event of an emergency and to be notified regarding school events. Both parents shall forward copies of any school notices to the other parent as soon as received;

(i) Both parents shall attempt to avoid scheduling activities or appointments for the child which would require her attendance or participation at said activity or appointment during a time when she is scheduled to be in the physical custody of the other parent without the parent's prior approval.

(2) Father shall have *primary physical custody* of Tara, under and subject to Mother's periods of partial custody as follows:

(a) *Holidays*

(1) Thanksgiving—Mother shall have partial custody on Thanksgiving each year from the Wednesday prior to Thanksgiving through the Sunday following Thanksgiving.

*(2)* Easter—Mother shall have partial custody on Easter every year from the last day of school prior to Easter until Easter Sunday evening.

(3) Christmas—In odd numbered years Father will have custody for Christmas from December 24 until December 26 at noon. Mother will have custody from December 26 at noon until the day prior to school commencing. In even numbered years, Mother's period of

Christmas custody shall begin on December 24 and end on the day prior to school commencing at noon.

(b) *Summer*

Mother will have custody for eight consecutive weeks during the summer each and every year beginning the first Saturday after the last day of school.

*(3) Transportation*

Father will be responsible to provide all necessary transportation to effectuate Mother's periods of partial custody and shall pay the costs of such.

*(4) Telephone Access*

Each parent shall allow the other parent to have liberal and reasonable telephone access with the minor child during that parent's period of partial custody. This shall include the child initiating such contact. Reasonable telephone access shall be construed to be during the child's normal waking hours, emergencies excepted.