J-A07036-14

2015 PA Super 32

| | | |
|---|---|---|
| IN RE: ADOPTION OF: M.R.D. AND T.M.D., MINOR CHILDREN | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.C., NATURAL FATHER | : | No. 1728 MDA 2013 |

Appeal from the Decree August 19, 2013
In the Court of Common Pleas of Lycoming County
Orphans' Court at No(s): 6365

BEFORE: GANTMAN, P.J., DONOHUE, J., AND STABILE, J.

DISSENTING OPINION BY GANTMAN, P.J.:     **FILED FEBRUARY 13, 2015**

With all due respect, I disagree with the majority's decision. Notwithstanding the majority's professions to the contrary, in my opinion the majority fails to follow the appropriate standard of review and ignores precedent. The Orphans' court has already weighed the termination evidence. Yet, the majority reinterprets the record to support reversal while conflating the concepts of termination and adoption. That decision does no justice to this case, especially in light of the changing image of what constitutes a "family unit." To the extent the majority addresses relevant concepts, I think it does so in the abstract and without practical wisdom. On this record, I remain firmly convinced Mother and Maternal Grandfather provided sufficient evidence to uphold the involuntary termination of Father's parental rights. Hence, I dissent.

The Orphans' court set forth its findings of fact and conclusions of law

in its opinion as follows:

*Finding of Facts*

1.   [Children] were born [in October 2004], in Lycoming County, Pennsylvania.   [C]hildren currently reside with their [M]other [in] Lycoming County, Pennsylvania. [C]hildren's mother is [M.D.], who was born [in May 1979].   Mother is currently unmarried.   [C]hildren's [M]aternal [G]randfather…currently resides [in] South Williamsport, Lycoming County, Pennsylvania.   Maternal [G]randfather is currently married to…maternal grandmother.

2.   [C]hildren's father is [M.C.].   Father resides [in] Pierre, South Dakota.  Mother and Father met while Mother was teaching in South Dakota in 2002.

3.   Mother and Father lived together in South Dakota until Mother returned to Pennsylvania in October 2003.

4.   Father moved to Pennsylvania briefly in January 2004, but returned to South Dakota.

5.   After Father left Pennsylvania, Mother learned of her pregnancy.  Mother informed Father of her pregnancy and Mother and Father spoke infrequently throughout the pregnancy.

6.   Mother moved into the home of [M]aternal [G]randfather during her pregnancy.

7.   The majority of Father's family resides in South Dakota.

8.   The majority of Mother's family resides in Pennsylvania.

9.   In October of 2004, Father traveled to Pennsylvania following [C]hildren's birth for a few days.

10.  Father is not on [C]hildren's birth certificate.

11.  In December of 2004, Father traveled to Pennsylvania

- 2 -

to visit [C]hildren. Father stayed in Maternal Grandfather's home.

12. In January of 2006, Father traveled to Pennsylvania for a visit. Mother planned special experiences between Father and [C]hildren such as their first haircuts, a professional photo session and shopping trips.

13. In February 2006, Mother discussed with Father she and [C]hildren traveling to South Dakota to meet [C]hildren's extended family. Father was not supportive.

14. In approximately August of 2006, Mother moved from [M]aternal [G]randfather's home to…Jersey Shore, Pennsylvania. The home was owned by Maternal Grandfather and had previously been a rental property. Maternal Grandfather charged Mother no rent for the home.

15. Father was aware of the address [change] as evidenced by an envelope sent by Father to [Jersey Shore, Pennsylvania] in December of 2006. The envelope was entered into evidence.

16. In August of 2006, Mother began working at Williamsport Area School District.

17. The parties' communication became extremely infrequent.

18. Mother received the last written correspondence sent by Father in January of 2007.

19. In the Spring of 2007, Father contacted Mother. Mother felt Father was drunk during this phone call.

20. Mother changed her phone number to an unlisted number following the Spring 2007 phone call. Mother's address remained unchanged until 2010. Maternal Grandfather's address remained the same from the time of [C]hildren's birth until the hearing on August 13, 2013.

21. At the time of the hearing on the Petition for Termination of parental rights, Father had not seen

[Children] since January 2006.

22. At the time of the hearing on the Petition for Termination of parental rights, Father had not sent [Children] written correspondence since January 2007.

23. Father did not send cards or gifts to [C]hildren because he was unsure if Mother's address had changed.

24. Father contacted an attorney in 2009 to discuss custody.

25. Father knows how to contact Mother's parents in Pennsylvania. Father had no contact with Mother's parents.

26. Father has provided little support for [C]hildren during the first few years of their lives. Father sent Mother money on one occasion and bought gifts on his January 2006 visit. Father had provided no further support.

27. Father has sent little more correspondence than six greeting cards to [C]hildren throughout their lives.

28. In…November of 2012, Father called and left a voicemail at Mother's place of employment, Williamsport Area School District. Mother did not return Father's phone call.

29. Father filed for custody in December 2012, Mother received Notice of proceeding in January 2013.

30. Mother [and Maternal Grandfather] filed [a] Petition for Termination of [Father's] Parental Rights on [January 29, 2013 and an amended petition on February 28, 2013].

31. [Children] did not learn of the existence of their biological father until the summer of 2013.

32. Mother informed [C]hildren of the existence of their biological father due to the pending termination hearing and the fact that [C]hildren would be speaking with the Guardian *Ad Litem* regarding [F]ather.

33. When Mother, or the Guardian *Ad Litem*, discussed Father with the children, they listed either "Pa Pa," Maternal Grandfather[,] or "God" as their father.

34. [C]hildren have no bond with Father.

35. Father's intention is to become more involved with [C]hildren and form a relationship with [C]hildren.

(Orphans' Court Opinion, filed August 19, 2013, at 5-9).

Mother and Maternal Grandfather filed an amended petition on February 28, 2013. On August 13, 2013, the Orphans' court held a termination hearing. As a result of the hearing and arguments presented, the court concluded:

> Mother has demonstrated good cause as to why this adoption should be allowed to proceed. Adoption by Maternal Grandfather in this case would simpl[y] memorialize that *status quo* of [Children's] lives. Maternal Grandfather will continue to raise them as his children.
>
> * * *
>
> The [c]ourt finds as of the date of the Petition to Involuntar[ily] Terminate his parental rights, Father has failed to perform his parental duties for a period of time in excess of six (6) months and has evidenced a settled purpose of relinquishing his parental claim. Father failed to contact his children or their Mother from the spring of 2007 until November of 2012. In November 2012, Father left a voice message for Mother at her place of employment. Father reasoned he did not know any other means to contact Mother. The message did not mention either of his sons. Mother had been employed by the Williamsport Area School District since 2006 and Mother had previously told Father of that employment. Mother was a teacher when Father met her. Mother's parents continued to reside at the same address where Father had visited with [C]hildren. Father had consulted an attorney regarding his custodial rights in 2009. Father's testimony

that he had no way of contacting Mother is not credible. Father's filing of a Petition for Custody in the 6-month period prior to the filing for Termination alone is not sufficient especially since this [c]ourt must consider the entire background of the case. Father has failed to exert himself to maintain a role in his children's lives. From the Spring of 2007, to the date of the filing of the Petition in February 2013, almost six years of the 8-year-old [C]hildren's [lives], Father has failed to show even a passive interest in [Children]. Father's intent to become more involved in the Children's lives is not sufficient. A parent has an affirmative duty to be part of [his child's] life.

* * *

In the present case, Father does not have a bond with [Children]. The only father figure that [Children] have is Maternal Grandfather. There was no testimony from any party demonstrating any bond between Father and [C]hildren. There was no evidence presented that [Children] had any recollection of or even knowledge of Father until the summer of 2013. It is clear that Father has no bond with [Children]. Further, termination of his rights would not destroy an existing necessary and beneficial relationship as there currently [is] no relationship between Father and [Children].

(***Id.*** at 5, 10-11, 12). On August 19, 2013, the Orphans' court granted Mother and Maternal Grandfather's petition and terminated Father's parental rights to Children. Father timely filed a notice of appeal on September 18, 2013, along with a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i).

Father now raises three issues for our review:

WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT [MOTHER AND MATERNAL GRANDFATHER] SHOWED GOOD CAUSE UNDER SECTION 2901 OF THE ADOPTION ACT TO PROCEED WITH THE ANTICIPATED ADOPTION OF

- 6 -

CHILDREN WAS CONTRARY TO THE EVIDENCE AND CONTRARY TO CONTROLLING PRECEDENT AND LAW, SPECIFICALLY:

1. WHETHER THE TRIAL COURT ERRED IN TERMINATING THE PARENTAL RIGHTS OF [FATHER] WHEN THE PROPOSED ADOPTION BY MATERNAL GRANDFATHER WOULD NOT CREATE A NEW, GENUINE, PARENT-CHILD RELATIONSHIP AND FOSTER THE CREATION OF A NEW FAMILY UNIT;
2. WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT THE ANTICIPATED ADOPTION OF THE CHILDREN BY MATERNAL GRANDFATHER WOULD BE IN THE CHILDREN'S BEST INTERESTS.

WHETHER THE TRIAL COURT ERRED IN TERMINATING THE PARENTAL RIGHTS OF [FATHER] PURSUANT TO 23 PA.C.S.A. [§] 2511(A)(1) AND IN FINDING THAT [FATHER] EVIDENCED A SETTLED PURPOSE OF RELINQUISHING HIS PARENTAL CLAIMS AND FAILED TO PERFORM HIS PARENTAL DUTIES.

WHETHER THE TRIAL COURT ERRED IN TERMINATING THE PARENTAL RIGHTS OF [FATHER] WHEN THERE WAS INSUFFICIENT EVIDENCE THAT THE BEST INTERESTS OF CHILDREN WOULD BE SERVED BY TERMINATION, PURSUANT TO 23 PA.C.S.A. [§] 2511(B).

(Father's Brief at 2-3).

Father argues Mother's entire family, not just Maternal Grandfather, took shifts caring for Children. Father claims Maternal Grandfather's flexible work schedule allows him to help Mother more often. Father acknowledges Mother and Children lived with Maternal Grandfather for the first two years of Children's lives. Nevertheless, Father asserts Mother then moved into her current residence and is financially supporting herself. Father avers Maternal Grandfather's financial contributions are only to help "pick up

slack." Father maintains Maternal Grandfather's actions are as an involved grandparent rather than as a parent for Children. Father emphasizes Mother and Grandfather's testimony stating they do not intend to live in the same residence to raise Children. Additionally, Father points to Maternal Grandfather's testimony stating his involvement with Children would not change even if the court denied termination of Father's parental rights. Father contends Maternal Grandfather still plans to include Children in his will regardless of the outcome of this case, so their ability to inherit will not change. Father submits terminating his parental rights would not serve the creation of a new family unit, and the only reason Mother and Maternal Grandfather sought involuntary termination of Father's parental rights was to get even with Father for seeking custody of Children.

Father further argues he attempted to contact Children, but Mother changed her telephone number in 2007, so he could no longer reach her. Father simply assumed Mother also changed her residence after she changed her telephone number. Father asserts he attempted online searches and e-mails to Mother but received no response. Father acknowledges he had contact information for Mother's parents, but insists they would not have helped him contact Mother. Father maintains he just wants to develop a relationship with Children. Father concludes he did not have a settled purpose to relinquish his parental claim and termination of his parental rights was not in the best interests of Children.

"The standard of review in cases involving the termination of parental rights is limited to the determination of whether the orphans' court's decree is supported by competent evidence." **In re Z.S.W.**, 946 A.2d 726, 728 (Pa.Super 2008) (quoting **In re Adoption of J.D.S.**, 763 A.2d 867, 870 (Pa.Super. 2000)). The well-settled principles of appellate review in this context are:

> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses, and on review, we will not reverse its credibility determinations absent an abuse of that discretion.

**In re A.J.B.**, 797 A.2d 264, 266 (Pa.Super. 2002). We have previously stated:

> In cases involving termination of parental rights, our scope of review is broad. All of the evidence, as well as the trial court's factual and legal determinations, are to be considered. However, our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child. We have always been deferential to the trial court as the fact finder, as the determiner of the credibility of witnesses, and as the sole and final arbiter of all conflicts in the evidence.

**In re S.D.T., Jr.**, 934 A.2d 703, 705-06 (Pa.Super 2007), *appeal denied*, 597 Pa. 68, 950 A.2d 270 (2008) (citations omitted). The burden of proof in a termination case is on the petitioning party, who must establish valid

grounds for termination by clear and convincing evidence.  *In re J.L.C.*, 837

A.2d 1247, 1251 (Pa.Super. 2003).

Section 2512 governs who may bring a petition to terminate parental

rights, and what the petition must contain, as follows:

> **§ 2512.  Petition for involuntary termination**
>
> **(a)  Who may file.**—A petition to terminate parental rights with respect to a child under the age of 18 years may be filed by any of the following:
>
> > (1)  Either parent when termination is sought with respect to the other parent.
> >
> > (2)  An agency.
> >
> > (3)  The individual having custody or standing in *loco parentis* to the child and who has filed a report of intention to adopt required by section 2531 (relating to report of intention to adopt).
> >
> > (4)  An attorney representing a child or a guardian ad litem representing a child who has been adjudicated dependent under 42 Pa.C.S.A § 6341(c) (relating to adjudication).
>
> **(b)  Contents.**—The petition shall set forth specifically those grounds and facts alleged as the basis for terminating parental rights.  The petition filed under this section shall also contain an averment that the petitioner will assume custody of the child until such time as the child is adopted.  If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists.
>
> *     *     *

23 Pa.C.S.A. § 2512.  If the petitioner is not an agency, then the petition

must include "an averment that an adoption is presently contemplated or

that a person with a present intention to adopt exists." ***In re Adoption of J.F.D.***, 782 A.2d 564, 567 (Pa.Super. 2001).

A petition to terminate a natural parent's parental rights, filed by one natural parent against the other under Section 2512(a)(1), is cognizable only if an adoption of the child is foreseeable. 23 Pa.C.S.A. § 2512(b); ***In re E.M.I.***, 57 A.3d 1278, 1286 (Pa.Super. 2012). ***See also In re B.E.***, 474 Pa. 139, 142, 377 A.2d 153, 154 (1977) (stating petition filed by one biological parent for involuntary termination of other biological parent's parental rights can survive only "in connection with a plan for adoption"). Even when a petition might satisfy the statutory requirements for termination, a court still cannot grant the petition without a corresponding plan for an anticipated adoption of the child. ***In re Adoption of L.J.B.***, 610 Pa. 213, 228, 18 A.3d 1098, 1107 (2011) (reversing involuntary termination of mother's parental rights where termination decree was entered to make way for stepmother's adoption of child, in light of new evidence that stepmother no longer wanted to adopt child). Thus, a "contemplated adoption" is required in this context because Section 2512(a)(1) was not designed as a punitive measure to penalize an ineffective or negligent parent; the attendant plan for adoption serves the primary purpose of the Adoption Act by putting the child in a new parent-child relationship with the adoptive candidate. ***In re E.M.I., supra*** at 1285-86.

Significantly, "Any individual may become an adopting parent." 23

Pa.C.S.A. § 2312. The "any individual" language permits a non-spouse to adopt a child even where one of the child's natural parents continues to retain custody, upon "good cause shown." ***In re Adoption of R.B.F.***, 569 Pa. 269, 803 A.2d 1195, 1202 (2002); 23 Pa.C.S.A. § 2901. A non-spouse adoptive nominee can be a child's maternal grandfather. ***In re Adoption of J.M.***, 991 A.2d 321, 326 (Pa.Super. 2010). The purpose of the "good cause shown" approach borrowed from Section 2901 is consistent with legal precedent that requires the court to analyze the integrity of the "proposed adoption" of the child and whether it was likely to happen. ***See In re T.R.***, 502 Pa. 165, 169 n.10, 465 A.2d 642, 644 n.10 (1983) (insisting court should actually consider adoptive candidate's intent to adopt and not merely accept adoption averment on its face).

As a general rule, the biological parent who files a petition to terminate the parental rights of the other biological parent, with the intent to retain custody or physical care of the child, does not have to file an accompanying report of intention to adopt. ***In re E.M.I., supra*** at 1286. ***See also*** 23 Pa.C.S.A. § 2531(c) (stating: "No report shall be required when the child is the child, grandchild, stepchild, brother or sister of the whole or half blood, or niece or nephew by blood, marriage or adoption of the person receiving or retaining custody or physical care").

In the process of terminating a natural parent's parental rights, the court must also examine if the proposed adoption fosters a "new parent-

child relationship." ***In re Adoption of L.J.B., supra*** at ___, 18 A.3d at 1108. The "singular concern" of the Adoption Act is to establish a new "parent-child relationship." ***In re T.R., supra*** at 169, 465 A.2d at 644. The rule makes sense because termination of the natural parent's rights and allowance of adoption serves to protect the integrity of the new family unit and stability for the adoptee. ***In re Adoption of J.D.S., supra*** at 871.

Assuming the pleading meets the threshold requirements, the court proceeds with the two-part test for termination of parental rights under Section 2511 of the Adoption Act. ***See*** 23 Pa.C.S.A. § 2511. The initial focus is on the conduct of the parent whose rights are at issue. ***In re C.L.G.***, 956 A.2d 999, 1004 (Pa.Super. 2008) (*en banc*). A party seeking termination under Section 2511(a)(1) must demonstrate the other parent has either: (1) shown a settled purpose to relinquish his parental claim to the child; or (2) failed to perform parental duties for at least six months prior to the termination petition. ***In re I.J.***, 972 A.2d 5, 10 (Pa.Super. 2009). The biological relationship of a parent and child does not vest in the parent a property right to the custody of the child. ***In re E.F.V.***, 461 A.2d 1263, 1267 (1983). Instead, a parent-child relationship is one of status, which protects the best interests of the child. ***Id.*** Maintaining a parent-child relationship requires a continued interest in the child and a genuine effort to maintain communication and association with the child. ***In re E.M.***, 908 A.2d 297, 305-06 (Pa.Super. 2006). ***See also In Re B.,N.M.***, 856 A.2d

847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (determining parental duty encompasses more than just financial obligation; relationship requires parent to exert himself to take and maintain place of importance in child's life and to act affirmatively with good faith interest and effort, even in difficult circumstances).

Termination under Section 2511(a)(1) involves the following:

> To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,
>
> > Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child **and** refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child **or** fails to perform parental duties.
>
> Once the evidence establishes a failure to perform parental duties **or** a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his…conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W., supra* at 730 (internal emphasis added). Regarding the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations

offered by the parent facing termination of his… parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M., supra* at 855 (citations omitted).

The second prong of the termination test centers on the needs and welfare of the child. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010); 23 Pa.C.S.A. § 2511(b). "A proper Section 2511(b) analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re T.D.*, 949 A.2d 910, 920 (Pa.Super. 2008), *appeal denied*, 601 Pa. 684, 970 A.2d 1148 (2009). In this context, the court should examine intangibles such as "love, comfort, security, and stability" when determining the needs and welfare of the child. *Id.* In the context of a termination petition filed by one biological parent against the responding parent, current case law indicates that at the termination hearing the petitioning parent must demonstrate the planned adoption is in the child's best interests, before the court will terminate the parental rights of the responding parent. *See In re Adoption of L.J.B., supra* at 232, 18 A.3d at 1110-11 (implying no gain to child or society can be achieved by terminating one parent's rights to permit adoption by another person who is unwilling or unqualified to adopt). Thus, as part of its Section 2511(b) analysis of the needs and welfare of the child in this setting, the court evaluates the "proposed adoption" that was averred in the termination petition. *See generally id.*

The case of ***In Re Adoption of J.M.*** is both precedential and instructive. The mother and the father in ***J.M.*** were the unmarried, natural parents of the child. Given the father's unmitigated parental inaction for two years, the mother and the maternal grandfather took primary care of the child. The mother and the maternal grandfather filed a private petition pursuant to 23 Pa.C.S.A § 2511 seeking involuntary termination of the father's parental rights. At the evidentiary hearing, Mother testified that the child does not know the father and fears him as the child would fear any other stranger. The father's total interaction with the child consisted of one birthday card and a single one-hour visit with the child that occurred in a Wal-Mart parking lot. Further, the father did not contact the mother to inquire about the child's needs and welfare. The court found the mother had established statutory grounds for involuntary termination of the father's parental rights under subsection 2511(a)(1). The maternal grandfather testified that he interacted with the child for two to four hours every day and more during the weekends, provided financially for the child, and sincerely desired to fill the void created by the father's absence. Additionally, the trial court acknowledged no bond existed between the father and the child. Nevertheless, the trial court did not find termination was in Child's best interest pursuant to subsection 2511(b), because "no new family unit would result given that Mother and Maternal Grandfather have maintained completely separate households since the child's birth and Maternal

Grandfather has never maintained physical custody of Child." ***In re Adoption of J.M., supra*** at 325-26.

On appeal, this Court reversed the trial court's order refusing to terminate the father's parental rights. This Court held the mother had proved by clear and convincing evidence that involuntary termination of the father's parental rights was warranted under Section 2511(a) and that severing the father's parental rights would best serve the child's developmental, physical, and emotional needs and welfare under Section 2511(b).

> Interspersed throughout its needs and welfare analysis, the trial court made factual findings that the adoption contemplated by Maternal Grandfather was not in J.M.'s best interest because it would not create a traditional, nuclear family. Essentially, the trial court considered cohabitation to be the *sine qua non* of the family unit. Specifically, the court reasoned, no new family unit would result given that [Mother and Maternal Grandfather] have maintained completely separate households since the child's birth and [Maternal Grandfather] has never maintained physical custody of [J.M.]. The trial court continued, although Mother seeks to fashion a formal parental relationship between Maternal Grandfather and J.M., she did not present evidence that a formal relationship was in the child's best interest or that J.M. considered Maternal Grandfather to be her father rather than her grandfather.

***Id.*** at 325-26. Our Court rejected the notion of cohabitation or living under the same roof as a necessary component of a "new family unit." ***Id.*** Instead, this Court reversed and remanded the case for the trial court to analyze whether the mother had succeeded in showing cause why the

- 17 -

proposed adoption should proceed. *Id.* at 327.

Instantly, the Orphans' court found that Mother and Maternal Grandfather had established ample evidence to support involuntary termination of Father's parental rights under Sections 2511(a) and (b), and shown good cause to proceed with the proposed adoption of Children. In eight years, Father visited Children only two or three times, and refused to allow them come to his home or meet his extended family. Father claimed he had no way of contacting Mother or Children, but the trial court found that testimony incredible. In any event, Father had an affirmative duty to take part in Children's lives, which included overcoming any obstacles to exercising that duty. *See In re C.M.S.*, 832 A.2d 457 (Pa.Super. 2003), *appeal denied*, 580 Pa. 687, 859 A.2d 767 (2004). At the time Father filed his petition for custody, he had not contacted or visited or supported Children for almost six years, which is well in excess of the six months timeframe pursuant to Section 2511(a)(1). Therefore, Father evidenced both a settled purpose of relinquishing his parental claim to Children **and** a failure to perform his parental duties. *See In re Z.S.W., supra*.

Further, the evidence demonstrated no bond existed between Father and Children. They do not identify him as their father. Children had no recollection or real knowledge of Father until 2013. Maternal Grandfather has consistently provided Children with the emotional and financial support to fill the void Father had created. Thus, Mother and Maternal Grandfather

demonstrated termination of Father's parental rights would best serve the developmental, physical, and emotional needs and welfare of Children under Section 2511. **_See In re T.D., supra_**; **_In re Z.S.W., supra_**. After deliberately eschewing all of his parental responsibilities for almost six years, should Father now be allowed to insinuate himself in Children's lives, based solely on entitlement, without regret or promise of reform?

I think the majority misapplies the appropriate standard of review. Although the majority acknowledges the Orphans' court found Maternal Grandfather's testimony credible, the majority improperly reweighs the evidence and decides the principal purpose of Mother and Maternal Grandfather's petition for involuntary termination of Father's parental rights was to punish or retaliate against Father for seeking custody. I think the majority infuses the petition with punitive intent. Contrary to the majority's view, I maintain we should permit the Orphans' court to sit as the fact-finder in the case and respect the court's findings on the credibility of the witnesses and the motivation for their actions. In its Rule 1925(a) opinion, the court wrote:

> Maternal Grandfather testified to adoption contemplated himself years before Father contacted Mother. This testimony was credible. Maternal Grandfather testified that he had not proceeded with adoption earlier because he "didn't see a need." "There was no threat of this happening and then all of a sudden it does…." In the case at hand, termination of parental rights only became necessary once Father contacted Mother in 2012. Maternal [G]randfather, Mother and [Children] acted as a family with little involvement from Father from the time of

[Children's] birth [in October 2004]. Father had not contacted Mother from Spring 2007 until December 2012. There were no indications from Father that necessitated Maternal Grandfather and Mother formalizing their family through termination of parental rights and adoption.

(Orphans' Court Opinion, filed October 17, 2013, at 2) (internal citations to the record omitted). In this statement, the court made clear it believed Mother and Maternal Grandfather's objective in filing their petition was to protect Children and **not** to retaliate or get even with Father. The timing of their petition is not dispositive of punitive intent, particularly in light of the court's conclusion otherwise. We are an error-correcting Court, without authority to reverse credibility determinations, which the record supports, simply to reach a different conclusion. ***See In re A.J.B., supra.***

Further, the majority demonstrates a fundamental misunderstanding of the facts of the case. Maternal Grandfather testified he had contemplated adopting Children for years but saw no immediate need to do so, given Father's desertion. Maternal Grandfather emphasized Father had been absent from the Children's lives for a majority of their eight years. When Father filed his unforeseen petition for custody of Children, Mother and Maternal Grandfather then needed court intervention to protect Children. The majority fails to recognize the distinction between the need for court intervention and the purposeful use of the court system to retaliate against another person. For eight years, Mother and Maternal Grandfather raised Children without Father's assistance and regardless of Father's deliberate

- 20 -

failure to act. Maternal Grandfather filled the void Father had created. Maternal Grandfather provided for the Children financially and emotionally the entire time. Mother and Children lived with Maternal Grandfather for two years after Children's birth. Maternal Grandfather shared parental duties with Mother every day by feeding Children, changing their diapers, picking them up from daycare, and putting Children to bed. After Mother and Children moved into a separate residence owned by Maternal Grandfather, he continued his daily involvement with Children and participated in Children's doctor appointments, school conferences, sports and extracurricular activities. Maternal Grandfather testified Mother and Children have more than half of their meals at his residence. Maternal Grandfather's actions exceed those of just a "normal" grandparent. The Orphans' court had competent evidence to decide which testimony was credible and whether the primary purpose of the petition for involuntary termination of Father's parental rights was to safeguard Children or merely as punishment or retaliation against Father. *See In re Z.S.W., supra*; *In re S.D.T., Jr., supra*.

Finally, the majority lacks appreciation for precedent. The majority acknowledges Maternal Grandfather's exercise of parental duties but concludes his conduct does not establish a "new parent-child relationship" or "new family unit." Like the trial court in *In re Adoption of J.M.*, the majority here considers cohabitation as the *sine qua non* of the "new family

unit." In fact, neither the Adoption Act nor relevant case law defines "new family unit" or "new parent-child relationship." In my opinion, this Court has already rejected the majority's inflexible notion. In other words, the fact that Mother and Maternal Grandfather reside in separate residences should not be dispositive of this case. *See In re Adoption of J.M., supra*. A rigid mindset like this one is alarming because it reverts to the perception of the traditional, nuclear family as consisting of a man and a woman, a relationship formalized through marriage, and cohabitation. To define "family-unit" this way improperly narrows the purpose of the Adoption Act and ignores evolving societal norms. Moreover, the majority's reliance on *In re Adoption of L.J.B., supra* is misplaced because the *L.J.B.* case concerned primarily a separation and a pending divorce between the child's father and his wife, who had been the adoptive nominee but no longer wanted to adopt the child. I think the facts of *L.J.B.* differ remarkably from the present case, and it is a fragile and unwarranted stretch to use *L.J.B.* as dispositive.

As the Orphans' court did, we should focus on the familial relationship Maternal Grandfather established with Children, instead of superficial, indefinite externals and what-ifs, which are nothing more than mere conjecture. The primary purpose of the Adoption Act is to secure Children in a parent-child relationship with the adoptive nominee. *In re E.M.I., supra*. Maternal Grandfather and Children currently enjoy a deep emotional bond.

Maternal Grandfather serves as a *de facto* father to Children. Adoption will still create a "new" parent-child relationship in the legal sense because it proposes to validate their respective rights and obligations. This legal authorization is what establishes the "new" in the already existing *de facto* parent-child relationship between Maternal Grandfather and Children. Maternal Grandfather testified he both understands and accepts the legal obligations he will have as a parent through adoption. Therefore, Children will not become "state-created orphans" as the majority suggests. I am convinced Mother and Maternal Grandfather demonstrated good cause why the adoption should proceed for purposes of terminating Father's parental rights, and I would affirm the Orphans' court decision granting their termination petition. Accordingly, I dissent.[1]

---

[1] I hope our Supreme Court will give us guidance in this context.