461 A.2d 1263

**In re E.F.V., a Minor.**

**Appeal of J.V. and A.V., Natural Parents.**

**Allegheny Children & Youth Services.**

Superior Court of Pennsylvania.

Argued Jan. 12, 1983.

Filed May 13, 1983.

Reargument Denied July 26, 1983.

Kathleen R. Mulligan, Pittsburgh, for appellants.

Marc Salo Drier, Pittsburgh, for appellee.

James A. Esler, Pittsburgh, for participating party.

Before POPOVICH, MONTGOMERY and VAN der VOORT, JJ.

VAN der VOORT, Judge:

This is a case concerned with the placement of Erica V., a three year old dependent child. The natural parents have appealed the entry of an Interlocutory Order that Children and Youth Services of Allegheny County (hereinafter CYS) develop a permanency plan for Erica, which would not include her natural parents, and that all visitation rights with the natural parents be temporarily terminated, pending a review on September 22, 1982. The parents petitioned the Lower Court to certify the Order as appealable under 42 Pa.C.S. § 702 on the ground that postponement of the appeal until after the review date set by the Lower Court

would result in the irreparable loss of their visitation rights. The Lower Court granted the requested certification. On September 22, 1982, after this appeal had been taken, the Lower Court ordered that its earlier order temporarily terminating visiting rights continue to remain in effect.

Erica's life had a sad and brutal beginning. Born September 13, 1979, she was taken from her parents' custody seven weeks later, suffering from multiple bruises of the face and chest, fractures of both legs, fractures of several ribs, and fractures of the clavicle, an arm bone, and a hip bone. These injuries had been inflicted by her parents over the child's seven-week life span, the outgrowth of marital stress which expressed itself not only in violence between the parents, but also in brutal abuses of the child.

At the Dependency Hearing, the parents assumed full responsibility for the mistreatment of their infant daughter, and joined in the request that she be declared a dependent child and a ward of the Court. This was done by order dated November 28, 1979, in which Erica was ruled a dependent, and was placed under the supervision of the Allegheny County Child Welfare Services in the custody of Childrens & Youth Services (CYS), with permission to place her at the Parental Stress Center.

During the next six months, Erica led a chaotic existence. She remained at the Parental Stress Center for approximately one month until December 21, 1979, when she was admitted to the Children's Hospital. She remained at the hospital until January 19, 1980, when she was discharged into a temporary foster home.

In the meantime, the parents' initial attempts at rehabilitation faltered. At the review hearing in the Lower Court on January 30, 1980, the Parental Stress Center reported that the parents failed 16 of 24 scheduled appointments and were uncooperative and unresponsive to the treatment offered there. At the conclusion of the hearing, the Lower Court discharged Erica from the Parental Stress Center and placed her in the custody of CYS, with permission to place her in a suitable special foster home. On May 12, 1980, she

was placed in the custody of John and Donna Dakleva, where she continues to reside in their custody. The foster parents are described in an unchallenged Finding of Fact by the Lower Court as "loving and capable foster parents".

On April 29, 1981, seventeen months after Erica had become a ward of the Court, her parents petitioned that she be returned to them. They alleged that they had undergone an extensive program of rehabilitation, that they had maintained regular visitations with Erica, and that they were now in a position to resume care of their child.

Over the next three months, the Court held a series of hearings on the advisability of returning Erica to her parents, during which it heard the views of some ten witnesses, including both of the natural parents, several social workers who had been involved in the attempted rehabilitation of the parents, a clinical psychologist, a therapist, and the foster mother who said that she would be supportive of whatever was in Erica's best interest, including a return to her natural parents. During the period of these hearings, the natural parents were allowed visits with Erica every other week at the Parental Stress Center.

On August 11, 1981, at the conclusion of its extensive hearings, the Court ordered that Erica should begin increased visitations with her natural parents, if all of the following conditions were met:

1) faithful participation by both parents in weekly sessions at Parents Anonymous;

2) faithful and consistent involvement of the father in job training or full time employment;

3) concrete progress by the mother in community activities and visits to friends and extended family members;

4) faithful attendance by either or both parents in such individual counseling sessions as may be directed by the staff of Parents Anonymous;

5) a positive adjustment by the child to the visits with her parents; and

6) faithful attendance by the parents to the visitation schedule.

In the Court's Opinion of July 27, 1982, the Court explained that "In our opinion, these conditions were necessary to assure the parents' continued participation in the programs which were established to alleviate the problems which led to the horrid mistreatment of this child."

The Order directed that if all of the conditions were met, the parents should visit Erica for a four-hour period every other week over a period of 90 days, and thereafter for six hours a week, with the case to be relisted for consideration on February 12, 1982, subject, however, to earlier consideration upon the motion of any party if any of the five conditions were not met or if Erica did not adjust to the visitations in an appropriate manner.

On November 18, 1981, a review hearing was held at the request of CYS. The testimony disclosed a complete breakdown in the program required by the Order of August 11. The parents had been terminated from a Parents Anonymous Group program dealing with child abuse because they had failed to attend two sessions without explanation. The father had not begun job training nor found employment. The mother's involvement in community activities or contact with family or friends remained minimal. The parents had missed the last two scheduled visits with their daughter without prior notice to CYS or without later explanation. Erica's foster mother testified that Erica had reacted drastically to the four-hour visits, and that for a ten-day period following the last visit, Erica had become uncontrollable with temper tantrums, throwing herself on the floor, banging her head, and biting herself and anyone else around her. Erica's father was present at the hearing but declined to testify. His counsel argued that the visits should continue on the August 11 schedule, and that an alternative program should be found for the parents.

At the conclusion of this review hearing, the Court directed that no visitation should take place in the next 90 days. The CYS was directed to establish a permanency plan for

Erica during this period, and a review hearing was scheduled for February 22, 1982. The natural parents petitioned for a rehearing, which was combined with the review hearing and held on February 24, 1982.

At that hearing, a child therapist testified on behalf of the natural parents that, in her opinion, it would be in Erica's best interest to remain permanently with her foster parents, but that it would also be in her best interest to maintain some contact with her natural parents. The foster mother testified that she and her husband were prepared to adopt Erica.

The hearing was continued for thirty days to allow counsel for Erica to produce professional testimony. At the adjourned hearing on March 24, 1982, a child psychologist testified on behalf of Erica to the effect that where a child is placed permanently with foster parents, a program of continuing visitation to maintain a relationship with the non-custodial natural parents would be detrimental to the well being of the child, increasing its sense of uncertainty and insecurity. He testified that it was not in the best interest of Erica to continue regularly scheduled visits with her natural parents.

On March 26, 1982, the Court entered the Order which is the basis of this Appeal. The Order and Findings of Fact which accompanied it are as follows:

## FINDINGS OF FACT

After several days of testimony and repeated efforts to facilitate the return of this child to her natural family, this Court finds that:

(1) The prognosis for return is extremely poor, and that the child is desperately in need of a permanent family.

(2) Erica was removed from her natural parents at the age of seven weeks after brutal abuse of the then tiny infant involving multiple bruises of the face and chest,

and fractures of both legs, several ribs, the clavicle, an arm bone and a hip bone.

(3) Repeated and extensive efforts have been made by several agencies to rehabilitate these young but dangerous parents.

(4) It is undisputed that Erica is and has been for almost two and one-half years in the custody of loving and capable foster parents.

(5) The foster parents thoroughly cooperated with efforts to return the child to her natural family. When those efforts failed, they indicated a desire to adopt the child. Their request is presently being reviewed by the County Law Department.

(6) All of the conditions which led to the brutal abuse of this child continue to exist in this family.

(7) In view of the fact that the support systems which were in place at the time of our last order are no longer in place, unsupervised visitation with her parents is dangerous to the welfare of the child.

(8) Supervised visitation is upsetting to the child and threatening to her need for a permanent loving family.

## ORDER OF COURT

AND NOW, to-wit, this 26th day of March, 1982, the petition of the natural parents for increased visitation is denied; Children and Youth Services is directed to develop a permanency plan consistent with this order. All visitation with the natural parents is temporarily terminated pending a review of this matter on September 22, 1982.

The Findings of Fact are abundantly sustained by the testimony taken by the Court at numerous intervals over a period of approximately a year. This is demonstrated in the Court's supporting Opinion of July 27, 1982. It is significant that the natural parents do not question Findings 2 and 4 dealing with the brutal abuse inflicted on Erica while in

her parent's home and describing Erica's foster parents as "loving and capable".

The natural parents challenge both aspects of the order of March 26th, the direction to develop a permanency plan that does not include them, and the six-month suspension of visitational rights while this is done. They contend that the direction to develop a permanency plan that does not include them overlooks their custodial rights as biological parents, and that it is beyond the jurisdiction of the Court because such a plan had not been requested by any of the parties in interest.

■ The biological relationship of parent and child does not vest in the parents a property right to the custody of the child. The relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child. *Commonwealth ex rel. Children's Aid Society v. Gard*, 362 Pa. 85, 97, 66 A.2d 300 (1949).

The Court's jurisdiction, indeed its duty, to make such orders concerning the custody of a dependent child as are in its best interests is spelled out in some detail in the *Juvenile Act* 42 Pa.C.S. § 6351. This is further developed in regulations recently promulgated by the Pennsylvania Department of Public Welfare (D.P.W.), which call for a prompt development of a permanency plan. In its "Foster Family Care Service Regulations"[1], D.P.W. has promulgated the policy that:

4. No child should be allowed to drift in an out-of-home placement without the specific decision that he will be returned to his/her parents or be freed from parental custody and placed for adoption.

■ The Lower Court and the supporting children's agencies of the county have devoted two years of effort to rehabilitate the natural parents to the point where it would

1. Pennsylvania Bulletin, Vol. 10, No. 11, March 15, 1980, pp. 1046–1054; Social Service Manual, Pennsylvania Department of Public Welfare, Chapter 11, Section 31, effective July 1, 1980.

be safe to return Erica to their custody. The natural parents have given a minimum of cooperation to these efforts, and have made little or no progress in correcting their deficiencies. Unless Erica is to be left in limbo indefinitely, it is clearly appropriate that the Lower Court now pursue the alternate course of directing CYS to initiate a proceeding in the Orphans Court of Allegheny County to terminate the parental rights of the natural parents under the *Adoption Act of 1980*, 23 Pa.C.S. § 2511(a)(1). If their rights are so terminated, the way is then clear for the adoption of Erica by her foster parents, who have cared for her for the past three years.

The parents also challenge the right of the Lower Court to temporarily terminate visiting rights with Erica. They contend that there is not evidence that they are mentally or morally deficient, or that they would physically harm Erica at such times.

However, these arguments overlook the present posture of Erica's placement. CYS and collaborating children's care agencies, under the direction of the Lower Court, have already spent two years in trying to rehabilitate the natural parents to the point where Erica could safely be returned to their custody. These efforts have failed, and unless Erica is to be kept indefinitely in temporary placement, the Court had no alternative but to direct a permanency plan involving Erica's foster parents and excluding her biological parents.

While that plan is being tested by a proceeding in the Orphans Court to terminate parental rights, a program of continued visitation with the natural parents would serve only to further undermine Erica's stability and engender severe developmental and behavioral problems. Erica has already exhibited serious emotional problems as a result of earlier visitations. It was certainly in the child's interest to suspend temporarily further visitations with the natural parents while the alternative permanency plan was put in place.

Parents do not have a property right in their children. Whatever claim they may make for either custody or visitation rights, is to be tested by what is in the best interest of the child. This was elaborated at some length in *Gard*, 362 Pa. at 92–3, 66 A.2d 300, where it was said:

An infant is the ward of the state and the latter may take the custody of the child away from even its own parents when the welfare of the child so demands. When a child is treated cruelly or is exposed to immoral or debasing conditions or is being neglected to its detriment it is the right and duty of the state, acting through its courts, to transfer the child's custody to persons who will treat the child in such a manner as to foster its well-being and promote its health and happiness. The settled law in Pennsylvania in such matters is well expressed in *Brown's Estate, Parks Appeal*, 166 Pa. 249, 252, 30 A. 1122, as follows:

"At any time during minority the court will make such disposition of a minor child, whose custody is in dispute, as the circumstances of the case demand, having always in view, first and last, and controlled mainly by the consideration which will best promote the welfare of the infant."

. . . .

... [T]he relationship of parent and child is a status and not a property right.

In the Restatement of the Law of Contracts, Vol. II, Section 583, there appears this comment: "Like marriage, the custody of young children is of importance to the State. It is not a property right of the parents."

So tested, the Court quite appropriately temporarily suspended visiting rights while an alternative permanency plan was being developed. If that plan is not pursued, or if the Orphans Court should refuse to terminate parental rights, it will then be in order to reopen the issue of visiting privileges.

Affirmed.