552 A.2d 261

In re Janet Lynn MILLER.

**Appeal of Lorraine MILLER & Charles Miller.**

Superior Court of Pennsylvania.

Argued Oct. 13, 1988.

Filed Dec. 29, 1988.

Sheila J. Fisher, Lancaster, for appellants.

Before ROWLEY, WIEAND and BECK, JJ.

WIEAND, Judge:

The appeal now being considered by this Court was taken from an order which continued custody of a dependent child in the Lehigh County Office of Children and Youth Services (CYS), reduced the number of authorized visits by the biological parents, and allowed the termination of support services for the parents. The parents contend that the trial court failed to make adequate findings, as required by 42 Pa.C.S. § 6351(f), and that the court's order was not in the best interests of the child. We find no merit in the parents' arguments and affirm the order of the trial court.

Janet Lynn Miller was born June 5, 1986 to Charles and Lorraine Miller. She was the Millers' third child. The first child had been taken from the Millers and placed in foster care by CYS in 1972 because of the mother's intellectual limitations, her lack of parenting skills, and also because of suspected child abuse. The second child born to the Millers had been taken from the hospital upon birth and placed directly in foster care. Therefore, CYS was familiar with Lorraine Miller's intellectual limitations and her inability to parent even before Janet Lynn was born. Upon Janet Lynn's birth, support services were immediately instituted

to help the mother with basic parenting skills. Visiting nurses went to the home three times a week to assist in bathing and feeding the child. A representative of Home Start Services spent an hour a week with the mother to assist her in basic child care; and the Wiley House Parents Sponsorship Program also sent a woman who visited the home two or three times a week. Finally, a caseworker from CYS remained in touch with the parents and visited once a week.

Janet Lynn Miller was adjudicated dependent on February 20, 1987, when she was eight months old. Under the court's order, physical custody was to remain with the child's parents, conditioned upon their properly feeding, bathing, and caring for their infant daughter. Although full support services continued, the mother nevertheless experienced serious difficulty in providing basic child care. The infant was not being bathed properly, was being fed irregularly, and was being given foods which were either inappropriate or spoiled.

On April 20, 1987, the child was removed from her parents' home on an emergency basis because she was not being fed properly. Thereafter, the services of Wiley House and the Visiting Nurses were discontinued, but the Home Start worker continued to visit the home to assist the child's mother in learning basic child care skills. On May 4, 1987, an agreed order was entered which continued the child's dependency status and her placement in foster care. Visitation for the parents was arranged as follows: one hour per week to be spent at the Easter Seal Society's Infant Stimulation Program to assist the parents and child to deal with the child's developmental delay; one hour per week at CYS with the active participation of a Home Start Worker; and one hour per week at CYS to be observed by agency caseworkers. The order also provided that the mother was to participate in a specialized counseling program sponsored by the Mental Health/Mental Retardation Center in order to learn basic skills such as personal hygiene, cooking and washing clothes.

On July 2, 1987, another agreed order was entered which continued the child's dependency status and her placement in foster care. The parties also agreed to enlarge the visitation between parents and child at CYS. This was intended to permit greater opportunity to evaluate the progress, if any, which the parents were making in learning child care skills.

On October 30, 1987, a review hearing was held. At that hearing, testimony was received from Dr. Gerald A. Zimmerman, a psychologist affiliated with the Wiley House Child and Family Guidance Center. He said that the father had a dependent personality and the mother, who is mildly retarded, had deficiencies in her ability to think and to parent children. In his opinion, to teach the mother caretaking skills and the development of appropriate expectations for the child would require supervision for as much as sixteen hours a day. Another expert, Edward R. Dubin, a licensed psychologist, testified that although the parents had made some progress in learning basic parenting skills, their progress was too slow to enable them to keep pace with the changing needs of the maturing child. He opined that the parents would never learn sufficient parenting skills to allow them to regain custody of their child. He recommended that services intended to aid in the achievement of that goal be terminated and that visitation be reduced.

A social worker who had observed the visitations testified that the mother had been "extremely rough" with the child. The witness voiced a fear that the mother would unintentionally hurt the child. She reported that the parents had failed to respond in a meaningful way when the child placed inappropriate objects in her mouth. She also testified that on one occasion a caseworker had found it necessary to intervene because the child had been choking, and on another occasion she herself had had to intervene because the child was frightened and screaming. Finally, she expressed alarm because of the parents' apparent lack of concern

regarding the sanitary condition of food which they gave to the child.

The court also received testimony from Frances Sonne, Esquire, who was the court appointed guardian ad litem for the child. She confirmed that the mother had given the child food which had fallen on the floor and that she used unnecessary force in handling the child. She recommended that custody remain in CYS and that the parents' visits with the child be reduced.

The trial court found that the child continued to be dependent and directed that her custody remain in CYS. The court also ordered that Home Start support services be terminated and that the parents' visits be reduced to one hour every other week. The parents appealed this order but withdrew the appeal after the court set an additional hearing at which the parents were to be permitted to present evidence to refute evidence of their lack of parenting skills.

The additional hearing was held on January 6, 1988, at which time the parents offered testimony from the mother's occupational therapist, a developmental psychologist who had observed the parents while another child had been present in their home, and the father's cousin who had observed the parents and child in the cousin's home. In rebuttal, testimony was received from Edward Dubin and a CYS caseworker, both of whom had observed a visitation between the parents and their child on the preceding day. Dubin said he observed the mother give the child a bottle which had been in a trash can with a dirty diaper, rock the child while holding a cup of hot coffee, and allow the child to walk while holding a fork. He said the mother used nonsense speech and did not engage in meaningful talk capable of aiding the child's language development. Although conceding that the mother appeared to love her child, he said that she was basically insensitive to the child's needs. The social worker related the stressful situations which appeared to develop between parents and child and said that she had had to intervene when the mother at-

tempted to give the child food to which, as the mother had been told repeatedly, the child was allergic.

The trial court found the witnesses produced by CYS to be more credible than those called by the parents. On January 12, 1988, the court entered an order which, consistently with its earlier order, terminated the services of Home Start and reduced the parents' visits to one hour every other week. It was from this order that the parents appealed.

Under the Juvenile Act, a child may be adjudicated dependent when it is established by clear and convincing evidence that he or she is without proper parental care and such care is not immediately available. See: *Helsel v. Blair County Children and Youth Services*, 359 Pa.Super. 487, 494, 519 A.2d 456, 459 (1986); *Matter of Yeager*, 309 Pa.Super. 491, 495, 455 A.2d 717, 719 (1983). Even a child who has been adjudicated dependent, however, may only be removed from his or her parents in cases where there is a clear necessity for such removal. *In the Interest of Ryan Michael C.*, 294 Pa.Super. 417, 421, 440 A.2d 535, 536 (1982); *In the Interest of K.B.*, 276 Pa.Super. 380, 393, 419 A.2d 508, 515 (1980). Following such a removal, issues of custody and visitation must be determined according to the child's best interests. *In re E.F.V.*, 315 Pa.Super. 246, 255, 461 A.2d 1263, 1268 (1983); *In re Bennage*, 303 Pa.Super. 318, 320, 449 A.2d 707, 708 (1982).

The Juvenile Act, at 42 Pa.C.S. § 6301 et seq., offers no guidance regarding the duration of support services. Because of its command to preserve family unity whenever possible, the Superior Court has held that "when there are inadequacies in the child's home ... [the state agency should] take the steps necessary to instruct the parents in the skills needed, and provide follow-up supervision in the home, where feasible." *In the Interest of Whittle*, 263 Pa.Super. 312, 316, 397 A.2d 1225, 1226 (1979). However, the Court has also recognized that such services are costly and that an agency's resources are not unlimited. *In the*

*Interest of M.A.,* 365 Pa.Super. 179, 183, 529 A.2d 31, 33 (1987).

Because of a concern for continuing family relationships, courts have been hesitant to deny parents regular visits with their children unless such visits will be gravely detrimental to the child. See: *In re: the Matter of Lisa and Cynthia,* 287 Pa.Super. 255, 260, 429 A.2d 1197, 1199 (1981); *Commonwealth ex rel. Sorace v. Sorace,* 236 Pa.Super. 42, 44, 344 A.2d 553, 554 (1975).

■ It must be remembered, however, that a child is a ward of the state, which may take the child away from its parents where the welfare of the child so demands. "When a child is treated cruelly or is exposed to immoral or debasing conditions or is being neglected to its detriment it is the right and duty of the state, acting through its courts, to transfer the child's custody to persons who will treat the child in such a manner as to foster its well-being and promote its health and happiness." *In re E.F.V., supra* 315 Pa.Super. at 255, 461 A.2d at 1268, quoting *Commonwealth ex rel. Children's Aid Society v. Gard,* 362 Pa. 85, 92–93, 66 A.2d 300, 304 (1949). While a permanent plan is being developed for such a child, a court may appropriately suspend visiting rights of the parents. If such a plan is not pursued or if parental rights are not terminated, the matter of visiting privileges may be reopened. *In re E.F.V., supra.*

■ In this case, the parents do not challenge the trial court's determination that their infant daughter remains dependent. They question only whether there was an adequate basis for the court's finding that it would be in the best interests of the child to continue out-of-home placement, reduce parental visits, and terminate support services to the biological parents. It is always hard for a court to terminate or limit parental rights. Nevertheless, after having made an independent review of the record in this case, we perceive no basis for interfering with the order entered by the trial court. The parents' demonstrated lack of parenting skills, including prolonged inability to properly

feed and safely supervise the child, has made it essential that custody of Janet Lynn remain in CYS. Moreover, because all efforts to impart parenting skills to the parents have failed, we cannot say that it was an abuse of discretion for the trial court to terminate additional support services. Similarly, we find no abuse of discretion in the trial court's decision to limit parental visits to one hour every other week. The order does not terminate parental visits. It continues to provide for "regular visitation" and has merely reduced the extent thereof in view of the withdrawn support services and the absence of further need to supplement and evaluate the parent-child relationship.

The Juvenile Act enumerates factors to be considered at a review hearing as follows:

(f) **Matters to be determined.**—At each disposition review hearing, the court shall:

(1) determine the continuing necessity for and appropriateness of the placement;

(2) determine the extent of compliance with the service plan developed for the child;

(3) determine the extent of progress made toward alleviating the circumstances which necessitated the original placement;

(4) determine the appropriateness and feasibility of the current placement goal for the child; and

(5) project a likely date by which the goal for the child might be achieved.

(g) **Court order.**—On the basis of the determinations made under subsection (f) and other relevant evidence, the court, in addition, shall:

(1) determine whether the child:

(i) should be returned to the parents, guardian or other custodian;

(ii) should be continued in placement for a specified period; or

(iii) because of the child's special needs or circumstances, should remain in placement on a permanent or long-term basis; and

(2) order continuation, modification or termination of placement or other disposition best suited to the protection and physical, mental and moral welfare of the child. 42 Pa.C.S. § 6351(f), (g). Our review confirms that the trial court complied with the requirements of this section. The circumstances which necessitated the child's placement have not been alleviated, and it may now be advisable to consider an alternate, permanent plan for the child. While an alternate plan is being developed, the court could, as it did, reduce parental visits and terminate support services, while continuing the child in the custody of CYS.

ORDER AFFIRMED.