J-S47001-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: J.L., A MINOR,<br><br>Appellee<br><br><br><br>APPEAL OF: LANCASTER COUNTY CHILDREN AND YOUTH SOCIAL SERVICE AGENCY | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br><br><br><br>No. 75 MDA 2016 |

Appeal from the Dispositional Order December 11, 2015
In the Court of Common Pleas of Lancaster County
Juvenile Division at No(s): CP-36-DP-0000110-2015

BEFORE:  SHOGAN, LAZARUS, and JENKINS, JJ.

MEMORANDUM BY SHOGAN, J.:                     **FILED AUGUST 11, 2016**

Lancaster County Children and Youth Social Service Agency ("CYS" or "the Agency") appeals from the order dated December 7, 2015, and entered on December 11, 2015, adjudicating a male child, J.L. ("Child") (born in May of 2015) dependent pursuant to 23 Pa.C.S. § 6302(1), and finding aggravated circumstances under 42 Pa.C.S. § 6302.[1]  The order further directed that, pursuant to 23 Pa.C.S. § 6351, both S.L. ("Father") and L.B. ("Mother") shall be granted a plan for reunification with Child and that CYS

---

[1] **See In re L.M.**, 923 A.2d 505, 508 (Pa. Super. 2007) (explaining that the thirty-day appeal period is not triggered until the clerk makes a notation on the docket that notice of entry of the order has been given) (citing **Frazier v. City of Philadelphia**, 735 A.2d 113 (Pa. 1999)).

shall submit a permanency plan to all counsel and the trial court for approval. We affirm.

We summarize the history of this case as follows.[2] In 2008, Father and Mother were convicted of criminal homicide, endangering the welfare of a child, and conspiracy to commit those offenses in relation to the April 2007 death of Father's daughter, Q.L. (born in 1997), from a prior relationship. Q.L. had suffered from cerebral palsy, was unable to speak, legally blind, and wheelchair-bound. Q.L. was injured from an accidental hot water burn while Mother was assisting her in a bathtub. Both Mother and Father failed to seek appropriate medical treatment for Q.L. for eight days. Their failure to assist Q.L. resulted in her injuries worsening and led to her death. After Father and Mother were convicted of the above-stated crimes, they were sentenced to serve prison terms in 2008. In May of 2014, after serving their minimum sentences, Father and Mother were released on parole and will remain subject to supervision until May of 2021. As a condition of her parole, Mother is restricted her from being around children under the age of twelve without supervision. Mother's parole officer has prepared a petition to remove that restriction. Father is not under any similar restriction.

---

[2] The trial court fully and aptly set forth a thorough recitation of the factual background and procedural history of this appeal in its opinion filed pursuant to Pa.R.A.P. 1925(a) on February 5, 2016. Trial Court Opinion, 2/5/16, at 1-15.

In May of 2015, Child was born. On June 1, 2015, CYS filed a petition seeking to adjudicate Child dependent, requesting a finding of aggravated circumstances, and seeking a protective order. On June 1, 2015, the trial court entered an order placing Child in the temporary legal and physical custody of CYS.

On June 3, 2015, a master held a shelter care hearing. The trial court entered a shelter care order on June 4, 2015, in which it found that the return of Child to the home of his parents was not in his best interest and ordered that temporary legal and physical custody remain with CYS, and Child's placement would remain in foster care. On June 12, 2015, the trial court entered an order modifying Child's placement to kinship care in the home of Father's niece, K.D., and her husband, L.D., while temporary legal and physical custody remained with CYS.

On September 3, 2015, the trial court held an adjudicatory hearing. In an order entered on September 28, 2015, the trial court continued the adjudicatory hearing. Based on the continuance of the hearing, on October 15, 2015, the trial court entered an order finding the necessity for, and appropriateness of, placement of Child. Child remained in the temporary legal and physical custody of CYS.

On December 7, 2015, the trial court held the continued dependency hearing. At the hearing, CYS presented the testimony of Jayme Suess, an intake supervisor at CYS, Amanda Schreiber, the ongoing caseworker

assigned to Child, and K.D., who is the kinship caregiver for Child, N.T., 12/7/15, at 5, 29, and 37. Father testified on his own behalf. *Id.* at 49.

In the order dated December 7, 2015, and entered on December 11, 2015, the trial court adjudicated Child dependent pursuant to the Juvenile Act, 23 Pa.C.S. § 6302(1), and found aggravated circumstances under 42 Pa.C.S. § 6302. The order further directed that both Father and Mother shall be granted a plan for reunification with Child, and CYS shall submit a permanency plan to all counsel and the court for approval, pursuant to 23 Pa.C.S. § 6351. On December 16, 2015, Father's trial counsel entered an appearance on behalf of Father.

On January 8, 2016, CYS timely filed a notice of appeal, along with a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(i) and (b). On January 13, 2016, the trial court entered an order dated January 8, 2016, and effective December 7, 2015, appointing Mother's trial counsel, Attorney Daniel H. Shertzer, Jr., to represent Mother on appeal.[3] On January 14, 2016, the trial court entered an order dated January 11, 2015, directing all parties except CYS to file answers to CYS's Pa.R.A.P. 1925 statement. The parties complied to the satisfaction of the trial court.

---

[3] Pa.R.A.P. 108(b) designates the date of entry of an order as "the day on which the clerk makes the notation in the docket that *notice* of entry of the order has been given as required by Pa.R.C.P. 236(b)." Pa.R.A.P. 108(b) (emphasis added).

CYS presents the following issue for our review:

Whether the trial court erred in its disposition of [C]hild's dependency matter, when it ordered that CYS] was required to make reunification efforts between Mother, [L.B.], and Father, [S.L.], and [C]hild?

CYS's Brief at 4.

CYS argues that the trial court abused its discretion when it ordered CYS to make efforts to reunify Mother, Father, and Child. CYS's Brief at 11-16. CYS asserts that the decision was manifestly unreasonable and was not in Child's best interest. CYS claims that it cannot identify any combination of services to provide to Father and Mother to create a reasonable likelihood that Child could be safely returned to the custody of one or both of the parents. *Id*. at 10. CYS is confident that it is not in Child's best interest to make reunification efforts because there is no way to ensure, regardless of the number and type of services put into place, that Child could be safely returned to the custody of either Father or Mother and that Father and Mother would prioritize the health and safety of Child. CYS's Brief at 17. Accordingly, CYS requests us to reverse the trial court order as it relates to reunification. *Id.*

The guardian *ad litem* argues that the trial court did not err in ordering a plan of reunification for Father, Mother, and Child. Rather, the guardian *ad litem* asserts that, after finding aggravated circumstances, the trial court examined the underlying facts and properly determined that reunification efforts were appropriate. Father contends that there was ample evidence to

support a finding that it was appropriate to provide the parents with a permanency plan containing a primary goal of reunification.

Our Supreme Court set forth our standard of review for dependency cases as follows:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

Regarding the definition of an abuse of discretion, this Court has stated the following:

> An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused.

*Bulgarelli v. Bulgarelli*, 934 A.2d 107, 111 (Pa. Super. 2007) (quoting *Arbet v. Arbet*, 863 A.2d 34, 39 (Pa. Super. 2004)).

Additionally, "[t]he burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency." *In re G., T.*, 845 A.2d 870, 872 (Pa. Super. 2004). Section 6302 of the Juvenile Act defines a "dependent child" as a child who:

> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. **A**

**determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]**

42 Pa.C.S. § 6302(1) (emphasis added).

Section 6341 of the Juvenile Act provides, in pertinent part, as follows:

**(a) General rule.—** After hearing the evidence on the petition the court shall make and file its findings as to whether the child is a dependent child. . . .

* * *

**(c) Finding of Dependency.—** If the court finds from clear and convincing evidence that the child is dependent, the court shall proceed immediately or at a postponed hearing, which shall occur not later than 20 days after adjudication if the child has been removed from his home, to make a proper disposition of the case.

42 Pa.C.S. § 6341(a) and (c).

In ***In re D.A.***, 801 A.2d 614 (Pa. Super. 2002), a panel of this Court stated:

[A] court is empowered by 42 Pa.C.S. § 6341(a) and (c) to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence. If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

- 7 -

*Id.* at 617. "The question of whether a child is lacking proper parental care and control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper care or control, and if so, whether such care and control are immediately available." *Id.* at 619 (citation omitted).

Section 6341(c.1) of the Juvenile Act addresses aggravated circumstances and provides as follows:

> **(c.1) Aggravated circumstances.**—If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child is dependent, the court shall also determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made and schedule a dispositional hearing as required by section 6341(c.1) (relating to disposition of dependent child).

42 Pa.C.S. § 6341(c.1).

Section 6302 of the Juvenile Act sets forth pertinent definitions of various terms and defines "aggravated circumstances" as including the following circumstance:

> (2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.

42 Pa.C.S. § 6302.

Regarding the placement of a child who has been adjudicated dependent, this Court has explained:

- 8 -

When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. ***See In re Sweeney***, 393 Pa. Super. 437, 574 A.2d 690, 691 (PA. Super. 1990) (noting that "[o]nce a child is adjudicated dependent . . . the issues of custody and continuation of foster care are determined by the child's best interests"). Moreover, although preserving the unity of the family is a purpose of the Act, another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child." ***In re E.F.V.***, 315 Pa. Super. 246, 461 A.2d 1263, 1267 (Pa. Super. 1983).

***In re K.C.***, 903 A.2d 12, 14-15 (Pa. Super. 2006).

Upon a careful review of the certified record in this matter, including the testamentary and documentary evidence, we discern that the trial court did not err or abuse its discretion in allowing Father and Mother an opportunity to reunify with Child if they successfully complete a permanency plan. We adopt the trial court's opinion for its analysis in support of its decision. Trial Court Opinion, 2/5/16, at 16-20. In addressing the claims of CYS, the trial court appropriately noted the binding instructions of our Supreme Court to this Court regarding appropriate appellate review of dependency decisions set forth in ***R.J.T.***, 9 A.3d at 1190. Trial Court Opinion, 2/5/16, at 22. We stress that the trial court emphasized that it has ordered CYS to provide Father and Mother only:

with the *opportunity* to achieve reunification with [C]hild. It has not ordered that reunification between the parents and the [c]hild take place at this time, as that outcome is ultimately

- 9 -

dependent upon the completion by one or both parents of the objectives set forth in [C]hild's Permanency Plan which the [c]ourt approved as part of the disposition. Further, to assure that [C]hild's interest in achieving timely permanency was advanced, the [c]ourt directed that [C]hild's Permanency Plan incorporate a concurrent permanency goal of placement for adoption.

Trial Court Opinion, 2/5/15, at 21-22 (emphasis in original). Accordingly, we are constrained by **R.J.T.** to affirm the order of the trial court, which we do on the basis of the trial court opinion.[4]

Order affirmed.

Judge Jenkins joins the Memorandum.

Judge Lazarus Concurs in the Result.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/11/2016

---

[4] The parties are directed to attach a redacted copy of the February 5, 2016 opinion in the event of further proceedings in this matter.

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
JUVENILE DIVISION

IN THE INTEREST OF                    :    Term No. CP-36-DP-110-2015
J██████ L██████ (D.O.B. 5/██/15)     :    FID: 36-FN-70-2015
                                      :

## OPINION *SUR* APPEAL

This opinion addresses the appeal of the Lancaster County

Children and Youth Social Service Agency (hereinafter, the

"Agency") of this Court's Order of Adjudication and Disposition-

Child Dependent dated December 7, 2015, which was entered upon

the Clerk of Courts' docket on December 11, 2015.

The Agency's Notice of Appeal was timely filed on January 8,

2016.

At the hearing, the father, S██████ L██████ (hereinafter,

"Father") was present and was represented by Jeremy S.

Montgomery, Esquire, and mother, L██████ B██████ (hereinafter,

"Mother") was present and was represented by Daniel H. Shertzer,

Jr., Esquire.  David J. Natan, Esquire, was present and

represented the Agency, and JoAnne Murphy, Esquire, was present

as the child's Guardian *ad litem*.  The subject child, J██████

L██████ (hereinafter, the "Child") was not present due to his

tender age (as he was born on May ██, 2015).

The Agency alleges one error by this Court, specifically,

that this Court erred by ordering the Agency to make

reunification efforts between the Mother, the Father and the

Child after finding that aggravated circumstances were proven as to both parents.

## FINDINGS OF FACT

1. J████ L█████ (hereinafter, the "Child") was born on May ██, 2015. (Agency's Petition for Temporary Custody)

2. S████ L█████ ("Father") is the biological father of the Child.

3. L█████ B████ ("Mother") is the biological mother of the Child.

4. Mother had been a care giver for Father's children for some years before she and Father entered into a relationship, and, as such, was familiar with them and their needs. (N.T. 9/3/2015 at pages 34-36)

5. Father was responsible for the personal needs and care of his son S████, ██., when that child was an infant. (N.T. 9/3/2015 at pages 89-92)

6. Father and Mother began a personal relationship about the year 2005. (N.T. 9/3/2015 at page 23)

7. During or about April, 2007, Father and Mother had been living together, in Harrisburg, Dauphin County, Pennsylvania, for approximately four months, having moved there from Cleveland, Ohio, in 2006. (N.T. 9/3/2015 at page 7)

8. In addition to Father and Mother, their household then consisted of Father's children S████, ██. (then about eleven

-2-

years of age) and Q█████ (then ten years of age) and Mother's son B███ (then nine years of age), and Father and Mother's children B██████ (then two years of age) and ██████ (then one year of age). (N.T. 9/3/2015 at pages 6-7, page 22, and page 61)

9. Father and another woman (not his former wife) share a daughter, S██████ S██████, who is presently approximately twenty-two years of age and who recently graduated from college. When Father and Mother moved from Cleveland, Ohio, to Harrisburg, Pennsylvania, that daughter remained in Ohio. (N.T. 9/3/2015 at page 67; N.T. 12/7/2015 at page 60 and pages 70-72)

10. Father is also the father of J██████ B████, who is approximately sixteen years of age. Father did not learn of this child until she was five years of age and he has not been involved in raising her. (N.T. 12/7/15 at pages 70-71)

11. Father and Mother previously had an additional child together, but lost that child to Sudden Infant Death Syndrome. (N.T. 9/3/2015 at page 21)

12. Father's daughter Q██████ suffered from cerebral palsy from birth; she was unable to speak, was legally blind, and was wheelchair bound. (N.T. 9/3/2015 at page 10)

13. Before the family left Ohio, Q██████ was involved in weekly physical therapy. (N.T. 9/3/2015 at page 89)

14. After they moved to Harrisburg and before the tragic events described below took place, Father and Mother saw to it

-3-

that Q████ had appropriate medical care and physical therapy at Hershey Medical Center. (N.T. 9/3/2015 at page 88)

15. Father's son S███, Jr., suffers from hydroencephalitis and has a drainage shunt installed between his head and his stomach. (N.T. 9/3/2015 at page 16 and page 37)

16. Before the tragic events described below took place and from the time S███, Jr., was an infant, Father actively participated in the care of S███, Jr.'s special and ordinary needs. (N.T. 9/3/2015 at pages 89-90)

17. After they moved to Harrisburg and before the tragic events described below took place, Father was working two full time jobs in order to support the household, while Mother was a stay at home parent. (N.T. 9/3/2015 at pages 18-19)

18. Despite his demanding work schedule, Father was an involved parent who found time for his children. (N.T. 9/3/2015 at page 43)

19. Mother had come from a troubled home where she had fulfilled parental duties when she was a child (due to her own mother's drug addiction). She nevertheless had earned her G.E.D., participated in the Jobs Corps when she was approximately nineteen years of age, and obtained education as a certified nurse assistant and also had trained to be a home health aid assistant. (N.T. 9/3/2015 at page 13 and page 27)

-4-

20. Mother was twenty-seven years of age in April, 2007, when Q██████'s injuries and subsequent death occurred, as described below. (N.T. 9/3/2015 at page 26)

21. At the time that Father and Mother were arrested (in April 2007) because of the events described below, the three children in their household who were of school age (Q██████, S████, Jr., and B████) were appropriately enrolled in and attending school programs designed to meet their needs. (N.T. 9/3/2015 at page 39)

22. On or about April 22, 2007, Father's daughter Q██████ was accidentally scalded while in Mother's care. (N.T. 9/3/2015 at pages 14-16)

23. Q██████'s scalding injuries were severe and consisted of third degree burns covering her back, the back of her arms, and the back and bottom of her left foot. (N.T. 9/3/2015 at page 9; N.T. 12/7/15 at page 14 and pages 36-37; Petitioner's Exhibits 1, 2, 3, and 5 of 12/7/15)

24. The severity of Q██████'s injuries was not immediately apparent to Mother, as there was no immediate blistering. (N.T. 9/3/2015 at page 21)

25. Mother hesitated to seek professional medical care for Q██████ because of concerns she had that Father's children might be placed in foster care. (N.T. 9/3/2015 at page 16)

26. Father was concerned about Q█████ when her injuries occurred, but Mother assured Father that Mother was able to care for her. (N.T. 9/3/2015 at page 17)

27. Mother believed that her medical training enabled her to adequately care for Q█████. (N.T. 9/3/2015 at page 36)

28. During the days which followed, Mother continued to feed Q█████ and to monitor Q█████'s condition, and she assured Father that the child was progressing. (N.T. 9/3/2015 at pages 17-18, page 37, and pages 59-60)

29. Father checked regularly on Q█████ during the days which followed her injury, but did not observe the extent of her injuries during that time, as he relied on Mother's reports. (N.T. 9/3/2015 at pages 60-63)

30. Based upon what Mother told him, Father believed that Q█████ was well enough to attend school during the week which followed her injury and that she was in fact attending school. (N.T. 9/3/2015 at page 44)

31. On the morning of the eighth day after Q█████ was injured, Mother discovered that the child's appearance had changed and her breathing was labored. (N.T. 9/3/2015 at page 18)

32. Mother informed Father about Q█████'s worsened condition. Father performed CPR and directed Mother to call

-6-

9-1-1. It was at that time that Father for the first time observed the full extent of Q█████'s injuries. (N.T. 9/3/2015 at page 18, pages 62-63)

33. By the time that medical intervention was sought, Q█████'s condition had deteriorated to the point that she could not be revived. Q█████ died that day, April 27, 2007. (N.T. 9/3/15 at pages 14-16 and page 18)

34. Q█████ died as a result of complications ensuing from her scalding injury, and those complications could have been prevented with appropriate medical intervention. (Petitioner's Exhibit 5 of 12/7/2015)

35. As depicted by photographs taken during the post mortem examination conducted upon Q█████'s body, the child's injuries were extensive and gruesome. (Petitioner's Exhibits 1, 2, and 3 of 12/7/2015)

36. Both Father and Mother were charged with criminal homicide (a felony of the first degree), endangering the welfare of children by a parent or guardian (a felony of the third degree), and separate counts of conspiracy relative to the homicide and endangering charges (and, accordingly, felonies of the first and third degree, respectively).[1]

---

[1] The Court takes judicial notice of the information found at Docket Number CP-22-CR-0002451-2007 in respect to Father and at Docket Number CP-22-CR-0002457-2007 in respect to Mother as found in CPCMS in respect to Findings of Fact 36. through 40.

-7-

37. Father was convicted of all charges on June 26, 2008, at the conclusion of a jury trial.

38. Father was subsequently sentenced on July 24, 2008, to a term of confinement of seven to fourteen years.

39. Mother was convicted of all charges by guilty pleas entered in the Court of Common Pleas of Dauphin County, Pennsylvania, on May 23, 2008.

40. Mother was sentenced on May 23, 2008, to a term of confinement of seven to fourteen years.

41. At the time of her guilty pleas, Mother acknowledged culpability for the death of Q██████. (N.T. 9/3/2015 at page 10)

42. While Father was incarcerated, Father elected to participate in the training and education which was available to him. Specifically, Father earned his G.E.D. and successfully completed Victim Awareness Education, the Violence Prevention - Moderate program, Heating, Ventilation and Air Conditioning training, the National Center for Construction Education and Research's Core Curricula course, the NCCER's HVAC Level One course, the NCCER's HVAC Level Two course, the AC&R Safety Coalition's training in safe handling of R-410A, the F.D.I.C. Money Smart Course, a 15 hour seminar on Small Business Ownership, and 165 hours of instruction in Vocational Warehouse Operations & Forklift Certification. (N.T. 9/3/2015 at page 64

-8-

and 77; N.T. 12/7/2015 at page 78; Father's Exhibit 1 of 9/3/2015)

43. Father was released from incarceration on May 6, 2014, at the expiration of his seven years minimum term. (N.T. 9/3/2015 at page 49)

44. During her incarceration, Mother took two different parenting classes, performed hospice services, took a course entitled Thinking For A Change, took violence prevention classes, participated in a weight loss program, and participated in a program referred to as the "puppy program". (N.T. 9/3/2015 at page 12)

45. Mother was released from incarceration on May 7, 2014, at the expiration of her minimum term. (N.T. 9/3/2015 at page 11)

46. Both Father and Mother will remain subject to state parole supervision until May, 2021. (N.T. 9/3/2015 at pages 49-50)

47. A condition of Mother's parole is that she must be supervised by a responsible adult if she is around a child who is under the age of twelve years. (N.T. 9/3/2015 at page 11)

48. Father has no criminal history other than for the convictions he sustained in relation to the charges filed in connection with Q██████'s death, except for a receiving stolen property conviction in Ohio he received when he was eighteen

-9-

years of age and for which he successfully completed six months of probation. (N.T. 9/3/2015 at page 50-51)

49. Mother has no criminal history other than for the convictions she sustained in relation to the charges filed in connection with Q███████'s death. (N.T. 9/3/2007 at page 7)

50. Neither Father nor Mother has had any violations of their parole. (N.T. 9/3/2007 at page 22 and page 50)

51. Neither Father nor Mother had any involvement with a Children and Youth agency or a similar agency before the incident relating to Q███████'s death. (N.T. 9/3/2015 at page 39 and page 54)

52. Following Father's arrest in April 2007, Father's child with his now former wife, S██████, Jr., returned to live with his mother in Ohio. (N.T. 9/3/2015 at page 53)

53. As a result of their arrest and incarceration, Mother's son B██████ and Father and Mother's children B██████ and B██████ were placed by the Dauphin County Social Services for Children and Youth, and their parental rights to these children were subsequently involuntarily terminated. (N.T. 9/3/2015 at page 6 and pages 53-54; N.T. 12/7/2015 at pages 17-18)

54. Father completed a mental health evaluation in July, 2013, which indicated that Father did not require any mental health services. (N.T. 9/3/2015 at page 55; Father's Exhibit 2 of 12/7/2015 at page 1 of 5)

-10-

55. Since Mother's release from incarceration, she underwent a mental health evaluation that indicated no further treatment was necessary. (N.T. 9/3/2015 at page 13)

56. Soon after their release from incarceration, Father and Mother resumed their relationship. (N.T. 9/3/2015 at pages 24-25)

57. During or about April, 2015, Mother contacted the Agency herself to report that she was pregnant because she did not want to hide anything from the Agency. (N.T. 9/3/2015 at page 28)

58. At about that same time, the Agency noted a referral with concerns that the parents had been incarcerated and their parental rights to another child had been terminated. (N.T. 12/7/2015 at pages 6-7)

59. The Agency next received a referral on May 30, 2015, to the effect that the Child had been born at Women's and Babies Hospital in Lancaster. (N.T. 12/7/2015 at page 7)

60. The Agency caseworker went to the hospital to inquire of the parents if there were other resources for the Child due to the Agency's concerns. (N.T. 12/7/2015 at page 7)

61. There were environmental concerns regarding the home in which the parents were living so the Agency was granted temporary legal and physical custody of the Child. (N.T. 12/7/2015 at pages 7-9)

-11-

62. The Shelter Care Hearing was held June 3, 2015, at which time temporary legal and physical custody of the Child were granted to the Agency. (Master's Recommendation for Shelter Care)

63. A kinship resource (specifically, Father's niece) was identified and the Child was moved to the kinship home on June 12, 2015. (N.T. 9/3/2015 at page 79; N.T. 12/7/2015 at pages 9-10)

64. Mother is employed as a cashier at a Dollar Tree store on a full-time basis. (N.T. 9/3/2015 at page 12 and page 30)

65. The parents are having supervised weekly visits with the Child. (N.T. 12/7/2015 at page 12)

66. The parents attend all the visits with the Child. (N.T. 12/7/2015 at page 22)

67. Both Father and Mother interact with the Child during the visits. (N.T. 12/7/2015 at pages 29-30)

68. The caseworker does not have to intervene during the visits with the Child. (N.T. 12/7/2015 at page 30)

69. The Agency has no concerns regarding the visits between the parents and the Child. (N.T. 12/7/2015 at page 13)

70. The parents attended three of the Child's four scheduled medical appointments which had occurred before the final hearing date. (N.T. 12/7/2015 at page 26)

71. As of the first hearing date (on September 3, 2015), Father was forty years of age and Mother was thirty-six years of age. (N.T. 9/3/2015 at page 26 and page 51)

72. Mother has learned that she cannot do everything by herself and she will seek the appropriate help in taking care of the Child. (N.T. 9/3/2015 at page 27)

73. Mother accepts responsibility for what happened to Quiniece and she is remorseful about her actions at that time. Father also accepts responsibility for his daughter's death. (N.T. 9/3/2015 at pages 27-28, page 40, and page 79)

74. The present parole restriction requiring that Mother be supervised around children under the age of twelve years can be modified in the event the Child is returned to her care. Father and Mother's state parole officer has prepared a petition for Mother's restriction regarding no unsupervised contact with children under the age of twelve years to be removed. (N.T. 9/3/2015 at pages 28-29; N.T. 12/7/2015 at page 76)

75. Father and Mother will cooperate with the Agency caseworker in respect to services. (N.T. 9/3/2015 at page 26 and page 81)

76. Father and Mother have proactively worked on strategies to better address decision making in the future. Father utilizes the practice of journalling to help him think through issues and

-13-

limit responses born of emotional reaction. (N.T. 9/3/2015 at page 78; N.T. 12/7/2015 at page 68)

77. Mother and Father began attending parenting classes (specifically, the COBYS Family Nurturing Program[2]) on their own volition and have successfully completed the course. (N.T. 9/3/2015 at page 29; N.T. 12/7/2015 at pages 52-53)

78. Since about February, 2015, Father has been successfully self-employed as an electrician, and he has a steady stream of work which he performs as a sub-contractor. Father's work hours are adjustable so that he has flexibility to care for the Child. Father has been offered a position as an employee of an electrical company, which position would include benefits. (N.T. 9/3/2015 at page 31, pages 58-59, and pages 65-66; N.T. 12/7/2015 at page 61-62)

79. Mother has no drug or alcohol contingencies as terms of her parole; with the exception of the condition previously mentioned regarding contact with children under twelve years of age, all Mother is required to do is to maintain employment and housing. (N.T. 9/3/2015 at page 32)

80. Father's terms of parole require him to maintain employment; further, he is subject to random drug screens. There are no parole restrictions regarding Father and children. (N.T. 9/3/2015 at page 50 and page 58)

---

[2] The Court is aware that this program is sponsored and endorsed by the Agency.

-14-

81. Father proposes to live in a two bedroom apartment with the Child. Father moved to the two bedroom apartment on September 9, 2015. (N.T. 9/3/2015 at page 72; N.T. 12/7/2015 at page 51)

82. Father has a crib and the other necessities to care for the Child. (N.T. 9/3/2015 at page 72)

83. Father has extended family in the area. Father's sister-in-law is available to care for the Child while he is at work, and if she is not, Father is capable of obtaining appropriate alternative child care. (N.T. 9/3/2015 at page 59 and page 66)

84. Father's daughter, who is 22 years old and presently lives in Ohio, is available to care for the Child and would move in with Father if necessary. (N.T. 12/7/2015 at pages 54-55, 60)

85. Mother is not listed as a tenant on the lease of Father's apartment, and she is not living with Father there. (N.T. 12/7/2015 at page 51 and page 58)

86. Both parents express that their concern as parents for the Child are their first priority. Mother is willing to separate from Father if the Child is returned to Father's care. Father believes the Child needs both Mother and himself, but if he is required to not have Mother present, he will abide by that. (N.T. 9/3/2015 at pages 41-42 and pages 47-48; N.T. 12/7/2015 at page 69)

## CONCLUSION OF LAW

The record amply supports the Court's decision, in a proper exercise of its discretion, that the Agency shall make reasonable efforts toward the reunification of the parents with the Child.

## DISCUSSION

After hearing the extensive testimony in this case, the Court determined in its sound discretion that the Agency should be required to make efforts at reunification between the parents and the Child despite the finding of aggravated circumstances.

The Agency, in its appeal, claims that the Court "erred in its disposition." The Court's disposition included a directive that the Agency develop a Child's Permanency Plan establishing a primary placement goal of reunification and a concurrent placement goal of adoption.

The law defines the term "aggravated circumstances" to include, in portions relevant to this case, when:

- The parent of the child has been convicted of criminal homicide under 18 Pa.C.S. Ch. 25 (relating to criminal homicide) [42 Pa.C.S.A. § 6302 "Aggravated Circumstances" (3) (i)]
- The parent of the child has been convicted of conspiracy to commit such crime. [42 Pa.C.S.A. § 6302 "Aggravated Circumstances"]

-16-

- The parental rights of the parent have been involuntarily terminated with respect to a child of the parent. [42 Pa.C.S.A. § 6302 "Aggravated Circumstances" (5)]

In the instant case, it is indisputable that the Agency proved by clear and convincing evidence the existence of aggravated circumstances as to both Father and Mother in respect to each of these distinct statutory bases. The Court made the requisite findings.

A finding of aggravated circumstances permits, but does not require, the Court to relieve the Agency of the responsibility to make reasonable efforts to reunify a family. The relevant portion of the Juvenile Act provides:

> If the court finds from clear and convincing evidence that aggravated circumstances exist, **the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made** or continue to be made and schedule a hearing as required in section 6351(e)(3) (relating to disposition of dependent child). 42 Pa.C.S.A. § 6341 (c.1). (Emphasis supplied.)

Accordingly, the existence of aggravated circumstances does not bring to a halt the Court's necessary inquiry into whether the Agency should be ordered to make reasonable efforts to support family reunification. Rather, the statute confers authority upon the Court to order that such efforts be made in the Court's discretion. After finding the existence of

-17-

aggravated circumstances, the Court's decision whether to pursue reunification is made on a case-by-case basis. *In re R.P.*, 956 A.2d 449, 455 (Pa.Super. 2008)

In approaching this case, as with every juvenile dependency matter, the Court is guided by the first stated purpose of the Juvenile Act, that being "[t]o preserve the unity of the family whenever possible." 42 Pa.C.S.A. § 6301 (b) (1). In essence, within the context of juvenile dependency, the reunification of a child found to be dependent with that child's parents is the fundamental objective of the law for so long as the child's paramount interests in respect to safety, timely permanency and well-being are served. *See In the Interest of C.B. and A.L.*, 861 A.2d 287 (Pa.Super., 2004).

There is no question that there is a history of tragedy in this case. An accident led to horrific injuries to a child of just ten years of age; a combination of ignorance, medical neglect, and misapprehended priorities on the part of the parents extended the child's suffering and led to her death. Those sad realities are not lost on the Court. It was evident in the course of the hearing that those sad realities and their consequences are not lost upon the parents either. Father, whose prior involvement in the criminal justice system was negligible, and Mother, who had no prior involvement in the criminal justice system whatsoever, each served seven years in state prison.

-18-

Father and Mother lost their parental rights to two children and Mother lost her parental rights to her son by an prior relationship as a result. Rather than despair or sink into anti-social behaviors, they each took extensive, even extraordinary, steps in respect to their personal rehabilitation. Of great significance, they each have accepted personal responsibility for what happened and each is appropriately remorseful.

But the Court's focus must be upon where the needs of the Child will be best met, as the Child's needs are paramount. Here, the parents have actively engaged in a process of re-ordering their daily lives and, importantly, the dynamics of their own relationship so as to place the needs of the Child ahead of their own needs. They are more mature than they were and their relationship is more mature than it was when the tragic death of the child occurred in 2007. They have not put mere voice to the principle of parental responsibility, they have acted upon it. Notably, it was Mother who invited the Agency to look into the parents' circumstances before the Child was born. Together they have undertaken and completed the parenting program which the Agency routinely requires parents to take. They have each expressed a willingness to go to all ends to convince the Court and the Agency that they are worthy of having the Child returned to them. Father has acquired valuable skills which, through his hard work and commitment, have enabled him to provide

-19-

amply for the Child. He has assembled a home which will be more than sufficient for the Child, and has made arrangements to assure that the Child will be cared for at all times. Both parents are willing to sacrifice their mutual relationship if that is necessary in order to secure for Father the opportunity to parent the Child. The Court was struck by the sincerity and credibility which both Father and Mother displayed during the course of their testimony.

It is often said that past performance is the best predictor of future performance. In this case, the Agency urged the Court to embrace the sad events of April, 2007, as the sole measure of these parents' past performance. However, the sad and complex circumstances of the last week of April, 2007, were an apparent aberration when considered in the context of the totality of the circumstances. Credit must be given to Father and Mother for their hard work and commitment toward building a successful blended family which preceded the tragedy. Father worked two full time jobs which afforded him little time for sleep, but he still managed to be an active, involved parent. Mother took on the responsibility of caring for and nurturing two special needs children who were not her own in addition to parenting three children of her own. The five children in their household were appropriately fed, clothed, housed, and educated, and their ordinary and special medical needs were met. It is not difficult

-20-

to imagine the enormous amount of energy and devotion which was required of both Father and Mother during that time.

While the Court cannot ignore or endorse the medical neglect which caused the death of a child, the Court can readily envision that these parents, who are now mature, psychologically and physically capable, and, above all, who are focused, highly motivated, and committed to the Child, present a strong likelihood that the Child's needs for safety and well-being will not only be secure but will be highly valued and exceeded should he eventually be returned to their care. The Court has confidence that these parents will complete the objectives of the Child's Permanency Plan which the Court awarded them to enable the Child to be reunited with them in a timely manner. This is a case where the preservation of the unity of the family is not just possibility, but where it is the most probable outcome.

That being said, it must be noted that the Court has found dependency and has ordered the Agency to provide these parents with the *opportunity* to achieve reunification with the Child. It has not ordered that reunification between the parents and the Child take place at this time, as that outcome is ultimately dependent upon the completion by one or both parents of the objectives set forth in the Child's Permanency Plan which the Court approved as part of the disposition. Further, to assure that the Child's interest in achieving timely permanency was

-21-

advanced, the Court directed that the Child's Permanency Plan incorporate a concurrent permanency goal of placement for adoption.

The Supreme Court of Pennsylvania has offered highly relevant observations about the role of the trial court compared with the role of the appellate court in juvenile dependency cases where a decision regarding a child's placement goals is at issue. In his majority opinion in the case *In the Interest of R.J.T., a Minor*, Justice Max Baer wrote as follows:

> This case epitomizes why appellate courts must employ an abuse of discretion standard of review, as we are not in a position to make the close calls based on fact-specific determinations. Not only are our trial judges observing the parties during the hearing, but usually, as in this case, they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan. Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court. The Superior Court in this case did just that in highlighting negative information regarding Parents. Moreover, the Superior Court did not conclude that the trial court's findings of fact were not supported by the record. Accordingly, we conclude that the Superior Court erred in reevaluating the evidence. 608 Pa. 9, 27, 9 A.3d 1179, 1190 (2010).

The Agency charges the Court with abusing its discretion by ordering the Agency to support reunification efforts. An abuse of discretion must be demonstrated by manifest unreasonableness,

-22-

partiality, prejudice, bias or ill-will. *Christianson v. Ely*, 575 Pa. 647, 838 A.2d 630, 634 (2003).

There simply is no basis to suggest that this Court has abused its discretion in the instant case. Rather, the Court's decision to establish reunification with the parents as the primary placement goal for the Child is well grounded in the facts of record in this case.

## CONCLUSION

The Agency's appeal is without merit. The Order of Adjudication and Disposition-Child Dependent dated December 7, 2015, and entered upon the docket on December 11, 2015, should be affirmed.

I certify this document to be filed in the Lancaster County Office of the Clerk of the Courts.

Jacquelyn E. Pfursich
Clerk of Courts
Dated: 5 February 2015

BY THE COURT:

Jeffrey J. Reich, Judge

ATTEST:

Copies to:

David J. Natan, Esquire, Counsel for Children and Youth Agency
Jeremy S. Montgomery, Esquire, Counsel for Father
Daniel H. Shertzer, Jr., Esquire, Counsel for Mother
JoAnne Murphy, Esquire, Guardian *ad litem*

2016 FEB -5 PH 9:29
LANCASTER COUNTY, PA
CLERK OF COURTS