J-S70013-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: M.P.H., A : IN THE SUPERIOR COURT OF
MINOR : PENNSYLVANIA
:
:
:
APPEAL OF: D.H., FATHER :
:
:
:
:
: No. 1008 EDA 2016

Appeal from the Order February 24, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000372-2015,
CP-51-DP-0002241-2013

IN THE INTEREST OF: S.J.H., A : IN THE SUPERIOR COURT OF
MINOR : PENNSYLVANIA
:
:
:
APPEAL OF: D.H., FATHER :
:
:
:
:
: No. 1010 EDA 2016

Appeal from the Order February 24, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000371-2015,
CP-51-DP-0002240-2013

BEFORE: OLSON, OTT, and MUSMANNO, JJ.

MEMORANDUM BY OLSON, J.: **FILED SEPTEMBER 28, 2016**

D.H. ("Father") appeals from the orders dated and entered on February 24, 2016, granting the petitions filed by the Philadelphia Department of Human Resources ("DHS" or the "Agency"), thereby involuntarily terminating Father's parental rights to his fraternal twin, minor

children, M.P.H., a female, and S.J.H., a male, born in October 2013, (the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), and (b), and changing the permanency goal for the Children to adoption under the Juvenile Act, 42 Pa.C.S.A. § 6351.[1]  We affirm.

In its opinion entered on May 26, 2016, the trial court aptly set forth the factual and procedural background of these appeals.[2]  As the trial court explained:

> [Mother] is the mother of [the Children]. . . .  Prior to [the Children's] birth, Mother also gave birth to four other children. . . .
>
> On October 20, 2008, this family became known to DHS when it received a General Protective Services (GPS) report alleging that Mother and her son, C.H., were being physically abused by [Mother's] paramour, M.B.  Mother would take C.H. and her other son, S.H. to spend the weekends at the home of M.B.  M.B. disliked C.H. and would hit and mistreat him.  C.H. stated that during the previous weekend M.B. hit him in the head.  M.B. was allegedly abusive towards Mother.  During an altercation between Mother and M.B., he threw S.H. into a chair.  M.B. would take the children and lock them in a room and he would not permit Mother to leave the home.  C.H. also complained of pain to his buttocks.  M.B. lost custody of his biological children and there were allegations that he may have sexually abused his biological daughter.  This report was substantiated.

---

[1] **See** Trial Court Opinion, 5/26/16, at 1.  In a separate decree dated and entered on November 23, 2015, the trial court voluntarily terminated the parental rights of the Children's mother, S.C.H. ("Mother").  Mother has not appealed the termination of her parental rights to the Children or the change in the permanency goal, nor is she a party to the instant appeal.

[2] On April 22, 2016, this Court, acting **sua sponte**, consolidated Father's appeals.

- 2 -

. . .

On November 4, 2010, DHS received a Child Protective Services (CPS) report alleging that on November 29, 2010, Mother witnessed M.B. grab the children's sibling, S.H., by the face. M.B. was also observed picking up S.H. by one arm. Mother suffered from borderline personality disorder, [bipolar] disorder, dyslexia, and she had a history of self-mutilation. There were domestic violence issues in the home[;] however, Mother was not ready to leave M.B. . . . The family had to boil water because the water heater was broken in the home.

On November 4, 2010, DHS received a supplemental report to the November 4, 2010 CPS report alleging that Mother was making a bottle of milk for S.H. and she heard him crying. Mother observed M.B. holding S.H. with one arm as he threw him in his pack and play. Mother was in therapy for her mental health and she was compliant. The report was indicated and M.B. was named as the perpetrator.

On July 19, 2011, Mother voluntarily relinquished her parental rights in regards to C.H. and S.H.

On November 1, 2013, DHS received a GPS report alleging that . . . Mother gave birth to [the Children]. . . . M.B. continued to be verbally and physically abusive towards Mother. . . .

[D]uring one of [Mother's] previous births, [Mother] was diagnosed with severe post-partum depression. Mother was also diagnosed with schizoaffective disorder and was not taking any medication.

On November 1, 2013, DHS received a supplemental report to the November 1, 2013 GPS report alleging that Mother resided with M.B. . . . There was no evidence that Mother was prepared to care for the newborns [(the Children);] however, paternity [for the Children] was not established. This report was substantiated.

On November 8, 2013, DHS obtained an order of protective custody (OPC) for [the Children] and placed them in a foster home through Women's Christian Alliance (WCA).

. . .

On November 11, 2013, [the Children] were placed in another foster home through WCA, where they currently remain.

. . .

An adjudicatory hearing was held on November 18, 2013 before [the trial court]. The Children were adjudicated dependent and committed to DHS. . . .

A permanency review hearing was held on March 21, 2014. The [trial] court received paternity results and learned that M.B. was not the father of [the Children]. . . .

A permanency review hearing was held on June 13, 2014 before a master. [Father] was named [] the putative father of [the Children]. A paternity test was ordered.

. . .

On March 1, 2015, a single case plan (SCP) meeting was held. The parental objectives were the following: 1) Mother to attend ARC; 2) [Father] to make his whereabouts known to DHS and follow through with [the trial court's] recommendations; and 3) Father to attend ARC. Mother and Father did not participate in the meeting.

A permanency review hearing was held on April 8, 2015 before [the trial court]. The court found the paternity test identified D.H. as the father of the Children. Mother and Father [were granted] one hour weekly visits at DHS. . . .

A permanency review hearing was held on June 29, 2015. . . . The court found the Children to remain as committed. Mother signed voluntary relinquishments for the Children.

[Father] has not been involved in any manner with [the Children] since they were committed to the care of DHS. [Father] has expressed no interest in setting up any SCP objectives or being a reunification resource for the Children. [Father] refused to participate in meetings and stated that he would not sign any documents. The [trial] court has noted [Father's] non-compliance with efforts toward familial

- 4 -

reunification. [Father] has not contacted the provider [or] DHS to learn about the developmental growth and well-being of the Children. [Father] has not been a parent to the Children nor has he been a visitation resource to his Children.

. . .

On February 24, 2016, [the trial] court held a goal change/termination hearing and heard testimony on DHS's petition to terminate Father's parental rights as to [the] Children[] and change the permanency goal to adoption. Father was present and represented by his attorney.

The assistant city solicitor first admitted into evidence the paternity test results for [Father] as 99.9999% probability for paternity of the Children, returned in January 2015, and recognized by the [trial] court on April 8, 2015.

Inmon Gardner, CUA case manager, testified he has been the case manager for the [Children] for seven [] months. Before that, he was outcome specialist on the case since September 21, 2014. He testified his role was to transport and supervise the visits of [the Children], make sure all the paperwork was signed and make sure the parents knew exactly what the goals were on the single case plan. He noted Father was not involved with the Children in September [] 2014. Father became involved shortly after that time, and he was offered visitation. However, his level of consistency was minimal, at best. Father had a [scheduled] visit every week, which totals approximately 24 scheduled visits. Father made about 14 of those visits but the majority of those, he was late. He would confirm the visits, then show up late or not show up.

Mr. Garner further testified Father's objectives were established: attend parenting classes at ARC [and] participate in their Pan Father's group. . . . [Mr. Garner] received a telephone call from ARC stating Father never attended. Mr. Garner testified Father never attended the Pan Father's group meetings, nor did he attend any of the single case plan meetings.

[Father] was also required to have a home assessment for the CUA. Regarding housing, Mr. Garner testified Father gave him various addresses all in Philadelphia. One was an address without an apartment number, which could not be verified, and

two other addresses could not be verified. . . . Thus, Father never presented any appropriate housing for reunification.

Father was referred for a parenting capacity evaluation and anger management, which he never attended. . . . Father stated he did not need anger management.

Mr. Garner testified that since the last court hearing, Father has not missed any of the four visits. During visits, Father's interaction with the Children was playful and required redirection sometimes. When the visits terminate[d], there [was] no reaction as to the Children.

On cross-examination, Mr. Garner [testified] Father has never had unsupervised visits with the Children, due primarily to his unstable housing situation. He further [testified that] Father has never contacted him about the Children's well-being . . . , their development, or their medical appointments.

Mr. Garner testified [that] the Children are currently placed in a loving foster home, where they were placed 28 months ago, since their birth. He [testified that] the home is safe and appropriate and is a pre-adoptive home for the Children. The interactions between the Children and the foster parent are very loving, carefree[,] and [with a] genuine affection [between the Children and the foster parent]. The Children look to the foster parent as their primary caregiver, and look to her for their care, comfort and support. . . .

Mr. Garner [testified that] reunification with Father is not possible at this time because of his non-completion of objectives, such as anger management and parenting classes. [Mr. Garner] further [testified that] the Children [would] not suffer irreparable harm if Father's parental rights [were] terminated. He further [testified that] it would be in the best interest of both Children to be adopted because they have known only one caregiver their entire lives, the foster parent and are bonded to her. Separating the Children from the foster parent would, in turn, cause harm to the Children.

Nicole Jones-Walker, CUA social worker, also testified. She began as the case manager [on] January 8, 2015 and had first contact with Father on February 10, 2015. She testified [that] Father's objectives were parenting classes, visitation[, and to]

participate in paternity testing. The initial single case plan meeting was held February 23, 2015, however, Father never attended parenting classes. She further testified, Father never attended anger management classes nor did he ever participate in ARC services. Father also did not provide her with a lease [or] an address where he was living.

Trial Court Opinion, 5/26/15, at 2- (some internal capitalization, citations, and quotations omitted).

On February 24, 2016, the trial court granted the petitions filed by DHS, involuntarily terminated Father's his parental rights to the Children, and changed the permanency goal for the Children to adoption under the Juvenile Act. In his timely appeal filed on March 24, 2016, Father raises three issues:

1. Did the trial court err when it found [DHS,] by clear and convincing evidence[,] had met its burden to terminate Appellant's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), [and] § 2511(a)(2)[?]

2. Did the trial court err when it found that the termination of [F]ather's parental rights was in the [C]hildren's best interests[,] and that [DHS] had met its burden pursuant to 23 Pa.C.S.A. § 2511(b)[?]

3. Did the trial court err in changing the permanent placement goal from reunification to adoption[?]

Father's Brief at vi (some internal capitalization omitted).[3]

_____

[3] Father stated his first issue somewhat differently in his concise statements, and has deleted any argument concerning section 2511(a)(5) and (8) from his brief, as the trial court did not terminate his parental rights under those subsections. We find that he adequately preserved his three issues for our
*(Footnote Continued Next Page)*

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***R.I.S.***, [36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id.***; ***see also Samuel Bassett v. Kia Motors America, Inc.***, 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***
>
> As [the Pennsylvania Supreme Court] discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. [The Supreme Court] observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re***

*(Footnote Continued)* ————————

review. ***Cf. Krebs v. United Ref. Co. of Pa.***, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and the statement of questions involved in his brief on appeal).

> ***Adoption of Atencio***, [539 Pa. 161, 165,] 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27 (2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).

> Moreover, we have explained:

> [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

***Id.***, *quoting* ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). The trial court terminated Father's parental rights under section 2511(a)(1), (2), and (b). We will focus on section 2511(a)(2) and (b), which provide as follows:

> **§ 2511. Grounds for involuntary termination**

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> . . .

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the

conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

In his brief, Father contends that DHS did not meet its burden of proof with regard to section 2511(a)(2). *Father's Brief* at 3. Father asserts that the record evidence showed that he made steps towards compliance with his Family Service Plan ("FSP") objectives. *Id.* In particular, Father states that he has housing and employment. *Id.* Father claims that the evidence showed that he had not missed a visit in the months preceding the termination hearing. *Id.* Father asserts that, at the hearing on February 24, 2016, DHS presented the testimony of the Community Umbrella Agency ("CUA") case manager, Inmon Gardner, who testified, on direct examination, that Father was minimally compliant because he had not missed any visits since the preceding court date. Father also states that Mr. Gardner testified, on cross-examination by the Child Advocate, that the preceding court date was in November of 2015. *Father's Brief* at viii.

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements:

> (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002).

The trial court concluded its analysis of section 2511(a)(2) as follows:

> As discussed above, the trial court found that Father evidenced an incapacity to parent. [] Father repeatedly failed to complete objectives and failed to maintain appropriate housing for the Children. He refused to participate in meetings and sign any documents. He has not contacted the provider or DHS to learn about the growth and well-being of the Children. Also[,] he failed as to his ability to bond as a parent. The court was not persuaded that Father could or would resolve these issues in the near future. Although Father testified that he had an on-line job as a life coach, no evidence was presented to corroborate his testimony.

Trial Court Opinion, 5/26/16, at 16.

After a careful review of the record in this matter, we find the trial court's factual findings are supported by the record, and the court's legal

- 11 -

conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of S.P.*, 47 A.3d at 826-27. We, therefore, affirm the termination of Father's parental rights with regard to the Children under section 2511(a)(2) on the basis of the trial court opinion entered on May 26, 2016.

Next, we review the termination of the parental rights of Father under section 2511(b). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super 2008) (*en banc*).

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], [the Pennsylvania Supreme] Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Father argues that the trial court erred in terminating his parental rights with regard to the Children under section 2511(b) because the

evidence showed that the Children have a positive parental bond with him, and call him "Dad". Father's Brief at 4. Father asserts that the termination of his parental rights does not serve the needs and welfare of the Children. *Id.*

The trial court summarized its analysis of section 2511(b) as follows:

This court finds credible the testimony from the Agency workers that the Children would not suffer irreparable harm if Father's rights were terminated and that termination of Father's parental rights would be in the best interest of the Children. The Children have spent their entire life in placement, since birth, with the same foster parent. They are now 31 months old, [and] they live in a nurturing and loving home with the foster mother, the only caretaker they have ever known, who meets all of their emotional and physical needs. The court concluded:

Well[,] considering the evidence and obviously, as a result of the testimony of [F]ather, there are some issues in contest, but I resolve the issue of credibility in favor of the DHS case workers – the subsequent case workers, whose testimony somewhat overlaps and reinforces each other. So, on the contested credibility, the issue is resolved in favor of DHS. That evidence, indeed, support[s], clearly and convincingly, that Father has failed to remedy any of the issues that brought these children into care. So[,] considering the evidence, under section 2511(a)(1) and (2)[,] and 2511(b), Father's parental rights are terminated. Since I previously terminated Mother's rights, the goals can be changed to adoption for these [c]hildren.

Trial Court Opinion, 5/26/16, at 16-17 (some internal capitalization omitted).

After a careful review of the record in this matter, we find the trial court's factual findings are supported by the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

- 13 -

*In re Adoption of S.P.*, 47 A.3d at 826-27.  In its opinion, the trial court found that the Children have been in placement in the same foster home for nearly three years, since birth.  Accordingly, it was proper to find no bond exists such that the Children would suffer permanent emotional harm if Father's parental rights were terminated.  *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008).  It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely."  *In re Adoption of C.L.G.*, 956 A.2d at 1007, *citing In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting").  We, therefore, affirm the termination of Father's parental rights with regard to the Children under section 2511(b), on the basis of the trial court opinion.

Finally, Father argues that the trial court erred in changing the permanency goal for the Children to adoption under section 6351 of the Juvenile Act.  Father's Brief at 4.  Father asserts that reunification was in the best interest of the Children.  *Id.*

The Pennsylvania Supreme Court recently set forth our standard of review in a dependency case as follows.

> "The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law."  *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).  We review for abuse of discretion[.]

***In Interest of: L.Z.***, ***A Minor Child***, 111 A.3d 1164, 1174 (Pa. 2015).

Regarding the disposition of a dependent child, section 6351(e), (f), (f.1), and (g) of the Juvenile Act provide the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection, and physical, mental, and moral welfare of the child.

When considering a petition for goal change for a dependent child, the trial court considers

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

***In re A.K.***, 936 A.2d 528, 533 (Pa. Super. 2007), *citing* 42 Pa.C.S.A. § 6351(f)).

Additionally, Section 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

> **(f.1) Additional determination.—**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> . . .
>
> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's

> parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f.1).

On the issue of a placement goal change, this Court stated:

> When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. *See In re Sweeney*, 574 A.2d 690, 691 (Pa. Super. 1990) (noting that "[o]nce a child is adjudicated dependent . . . the issues of custody and continuation of foster care are determined by the child's best interests"). Moreover, although preserving the unity of the family is a purpose of [the Juvenile Act], another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S.A. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child." *In re E.F.V.*, 461 A.2d 1263, 1267 (Pa. Super. 1983) (citation omitted).

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006).

In its opinion entered on May 26, 2016, the trial court found sufficient facts from which it properly determined that a goal change to adoption was best suited to the Children's safety and protection, and physical, mental, and moral welfare. Accordingly, we find Father's argument that the goal change to adoption under section 6351 of the Juvenile Act was erroneous lacks merit, and that the trial court did not error or abuse its discretion in changing the goal for the Children to adoption.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/28/2016